[No. 57638-6. En Banc. September 19, 1991.]

*In the Matter of the Dependency of* J.H., ET AL.

ETHAN SCHWEBKE, ET AL, *Appellants,* v. LUTHERAN SOCIAL SERVICES OF WASHINGTON, ET AL, *Respondents.*

*Philip A. Talmadge, Robert G. Nylander,* and *Talmadge Friedman & Cutler; Margaret Doyle Fitzpatrick* and *Mikkelborg, Broz, Fryer & Wells,* for appellants.

*Brian J. Linn* and *Law Offices of Linn & Schisel; Kenneth O. Eikenberry, Attorney General,* and *Kimberly A. Loranz, Assistant; Linda Passey* and *Carey & Burman,* for respondents.

ANDERSEN, J. —
## FACTS OF CASE

The foster parents of two children sought to intervene in juvenile court dependency actions in order to challenge the removal of the children from their home to another foster home. The juvenile court denied the foster parents' motion to intervene. We granted direct review and affirm.

The children involved in this action are J.H., who is 6 years old, and C.H., who is 4.

The children's mother has a history of serious drug abuse. This resulted in the placement of J.H. and C.H. in foster care on February 23, 1989.

Foster care is a child welfare service which offers substitute family care for children whose legal parents are unable or unwilling to provide day-to-day care.[1] Generally foster parents contract with a child placing agency to care

---

[1] RCW 74.15.010, .020(3)(e); *Smith v. Organization of Foster Families for Equality & Reform,* 431 U.S. 816, 823-24, 53 L. Ed. 2d 14, 97 S. Ct. 2094 (1977) (hereinafter *OFFER*).

for children on a temporary basis while a more permanent plan, such as return to the care of the legal parents or adoption, is developed.[2]

Between February 23, 1989, and October 27, 1989, the Department of Social and Health Services (DSHS) placed J.H. and C.H. in four different foster homes. The children were determined to be dependent in May of 1989.

On October 17, 1989, the children's mother indicated that she intended to begin a drug treatment program and wanted to work toward having the children returned to her care. At that time the juvenile court made DSHS and Lutheran Social Services jointly responsible for the care and supervision of the children.

Lutheran Social Services[3] placed the children in their fifth foster home on October 27, 1989. That foster home was the home of appellants (hereafter referred to as the foster parents). The foster parents accepted the children pursuant to a written agreement entitled "Permanency Planning Placement Agreement". The placement agreement, set forth in the margin,[4] states that the agency

---

[2]*OFFER*, 431 U.S. at 826. *See also* Cline, *Procedural Due Process for Foster Children: Liberty and Property Interests Implicated by Temporary Custody Determinations*, 20 Ariz. L. Rev. 279, 287-88 (1978).

[3]For convenience and because of their joint responsibility to supervise the welfare of the children, Lutheran Social Services and DSHS, together, are referred to hereinafter as "the agencies".

[4]The agreement states:

"On this date, Lutheran Social Services of Washington agrees to place [child's name and birth date], on a foster care basis with [the foster parents]. "It is understood by all parties that this child is not legally free for adoption. It is the intention of Lutheran Social Services to work toward a permanent plan for this child within 6-12 months, either return to the care of the birth parents, placement with an appropriate relative, or adoption by the foster parents [name of foster parents]. Lutheran Social Services of Washington will offer intensive casework services to the birth parents focused on early decision-making and will arrange safe and controlled visits between parents and child in an appropriate location.

"Lutheran Social Services will provide regular foster care payment and medical coupons to the foster parents for care of the child, as well as supportive casework services to the foster parents and child. Lutheran Social Services accepts

intended to develop a permanent placement plan for the children within 1 year. That plan would be either a return of the children to the home of their birth mother, placement with a relative or adoption by the foster parents. Under the agreement the agency retained final authority for placement decisions regarding the children.

The foster parents were initially told that the mother of the children had a serious drug problem, that there was little chance of rehabilitation and that an adoption by the foster parents was likely. It was not until the children had been with the foster parents for 3 weeks that the foster parents were told of the mother's intent to receive drug

---

full responsibility for all Juvenile Court Hearings required to achieve a permanent plan in this case and will keep the foster parents informed of developments relating to the child.

"It is understood that Lutheran Social Services retains final authority for placement decisions regarding this child.

"In the event the permanent plan becomes adoption by the foster parents, Lutheran Social Services will furnish all required documents to an attorney chosen by [the foster parents] to facilitate legal adoption.

"The foster parents agree to keep in regular contact with the agency social worker and to report promptly any illnesses or noteworthy events that occur with their family and the child.

"The foster parents agree to keep and use the child's given name, chosen by the birth parents, and to work cooperatively with the birth parents and the agency social worker in compliance with the case plan. They further agree to make the child available for all scheduled visits with the birth parents or other relatives. In addition, the foster parents agree to provide pictures of the child and developmental and/or school information to the social worker for the birth parents.

"All information about the personal circumstances and identity of the child and birth parents will be kept strictly confidential by the foster parents.

"Visitation with the birth parents: weekly visits 1 hour with the birth mother. Birth father has no visitation under current court order.

"Contact with other relatives: not anticipated at this time except for occasional visit with birth sister . . . and telephone or correspondence with brother . . ..

| | |
|---|---|
| "Social Worker | Date |
| "Foster Parent | Date |
| "Foster Parent | Date" |

treatment and of her stated desire to ultimately have the children returned to her care.

Not surprisingly, both children had emotional and developmental problems when they were placed in the foster parents' home, and were in need of therapy and special care. Both progressed extremely well with these foster parents and the children and foster parents apparently developed an attachment for each other.

During the first 8 months that the children were in the home of the foster parents, the mother's contact with them was limited. She saw the children during supervised visits once a week. In June 1990, the juvenile court, satisfied with the mother's progress, determined that the mother's contact with the children should be increased. Unsupervised visits between the children and their mother, who was apparently still residing at the drug treatment center, were ordered. Overnight visits were to begin, subject to the approval of the mother's and children's therapists.

As the mother's contact with the children increased, the foster parents' cooperation with the children's therapist, school and the agencies apparently decreased. The foster father allegedly told the children to call their mother "Auntie Alice" and encouraged the children to telephone the foster parents during visits with the mother. The foster parents also allegedly made inappropriate remarks about the mother in the presence of the children and began making independent decisions about the children's therapy and schooling, contrary to the agencies' direction. The agencies' efforts to work toward the permanent placement of the children in the home of the mother caused considerable stress, particularly to the foster mother. The foster parents challenged agency decisions regarding the children and eventually hired an attorney. They believed the agency took offense at those actions. The agencies claimed that the foster parents were impeding their efforts to reunite the children with their mother, so in October of 1990, the agencies decided to move the children to yet another foster

home (their sixth) pending their potential return to the care of their mother.[5]

The foster parents were given only a week's notice that the children were to be removed from their foster home. They immediately attempted to challenge the agencies' action. The foster parents argued that they had a legally recognized right to participate in the dependency proceedings. They also claimed that they had a constitutional right to challenge the removal of the children from their home. Their attempted intervention was unsuccessful and this appeal followed.

The evolving rights of foster parents is a subject of importance and, as the case before us amply demonstrates, one that tends to evoke strong emotions on the part of all involved. It also is an area of law which is in the midst of change. Contemporaneously with this case, or perhaps as a result of it, both the State Legislature and the Department of Social and Health Services made (or considered) significant changes in the rights and treatment of foster parents.[6] These matters and relationships are within the Legislature's power to study, consider and change where considered appropriate.

Three issues are presented for our consideration.

## ISSUES

ISSUE ONE. Do foster parents, who claim to be the "psychological" or de facto parents of foster children, have a right to intervene in dependency proceedings involving such children?

ISSUE TWO. Are foster parents who claim to be the "psychological" parents of foster children entitled to procedural due process before the children can be removed from the foster home?

---

[5]At oral argument before this court, counsel for the agencies indicated that the children were returned to the mother's care in late May 1991 and that the placement was being supervised by the agencies.

[6]Laws of 1991, ch. 326, §§ 15, 16, p. 1761 (vetoed by Governor Gardner); Laws of 1991, ch. 340, p. 1891.

ISSUE THREE. Are foster children entitled to due process before they can be removed from the home of foster parents who claim to be their "psychological" parents?

## DECISION

ISSUE ONE.

CONCLUSION. Foster parents do not have a *right*, based on statute or case law, to intervene in dependency proceedings. *Permissive* intervention, however, may be granted in the proper case at the informed discretion of the trial court.

The foster parents moved to intervene in the dependency action pursuant to the Superior Court Civil Rules, specifically CR 24, which provides in pertinent part:

> **(a) Intervention of Right.** Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.
>
> **(b) Permissive Intervention.** Upon timely application, anyone may be permitted to intervene in an action:
> (1) When a statute confers a conditional right to intervene; or
> (2) When an applicant's claim or defense and the main action have a question of law or fact in common. . . . In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

At the time the foster parents attempted to intervene in the juvenile court actions, no statute existed which conferred an unconditional right on foster parents to intervene in juvenile dependency proceedings. The first section of the above intervention of right rule (CR 24(a)(1)) thus does not apply.

The second section of the intervention of right rule (CR 24(a)(2)) requires that the prospective intervenor show: (1) an interest relating to the subject matter of the action; (2) that the ability of the intervenor to protect that interest

may be impaired by disposition of the action; (3) that the interest is not being adequately protected by existing parties; and (4) that the motion to intervene is timely made.[7] It is only the first factor — an interest in the subject matter — that is at issue in this case.

■ The meaning of "interest" is broadly interpreted, requiring flexibility and a case-by-case analysis and balancing of the relative concerns of the prospective intervenor, the original parties to the lawsuit and the public in the efficient resolution of controversies.[8] The interest which the intervenor seeks to protect must be one recognized by law.[9]

The foster parents argue that they are the "psychological" or de facto parents of J.H. and C.H. and therefore have a recognizable legal interest in maintaining a family relationship with the children.[10] The concept of "psychological" or de facto parent recognizes that children become attached to the adults who take care of their physical and emotional needs for affection and care on a day-to-day basis.[11]

> Whether any adult becomes the psychological parent of a child is based thus on day-to-day interaction, companionship, and shared experiences. The role can be fulfilled either by a biological parent or by an adoptive parent or by any other caring adult — but never by an absent, inactive adult, whatever his biological or legal relationship to the child may be.

---

[7]*Loveless v. Yantis*, 82 Wn.2d 754, 758, 513 P.2d 1023 (1973); 3B J. Moore & J. Kennedy, *Federal Practice* ¶ 24.07[1], at 24-50 (2d ed. 1991).

[8]*American Discount Corp. v. Saratoga West, Inc.*, 81 Wn.2d 34, 42, 499 P.2d 869 (1972). *See also* 3A L. Orland, Wash. Prac., *Rules Practice* § 5282 (3d ed. 1980).

[9]*In re Coverdell*, 30 Wn. App. 677, 680, 637 P.2d 991 (1981); 3A L. Orland § 5282, at 492.

[10]Whether the foster parents had in fact become the "psychological" parents of the children in this case has not been judicially determined.

[11]*In re B.G.*, 11 Cal. 3d 679, 692, 523 P.2d 244, 114 Cal. Rptr. 444 (1974).

J. Goldstein, A. Freud & A. Solnit, *Beyond the Best Interests of the Child* 19 (2d ed. 1979).

In certain limited circumstances our appellate courts have recognized the importance of psychological parents to the welfare of children. For example, in *In re Marriage of Allen*, 28 Wn. App. 637, 626 P.2d 16 (1981), a marriage dissolution case, the court found that the psychological relationship between a young deaf child and his stepmother and her daughters was "equivalent to that of a natural family entity."[12] The trial court awarded the stepmother custody of the child even though neither of the child's parents was unfit. The Court of Appeals affirmed the custody award, holding that custody of a child may be awarded to a nonparent when it would be detrimental to the child's growth and development to be placed with a legal parent.[13] The Court of Appeals noted, however, that a different standard of proof is required in juvenile court cases.[14]

The importance of the relationship between a child and nonparent caretakers also has been recognized in some juvenile dependency and termination cases.[15]

█ While the law recognizes the importance of the psychological parent to the child, this recognition does not go so far as to establish a *right* on the part of a foster parent to have the foster family relationship continue permanently where the placement of the child is by its very nature temporary, transitional and for the purpose of supporting reunification with the legal parents.[16]

---

[12]*In re Marriage of Allen*, 28 Wn. App. 637, 648, 626 P.2d 16 (1981).

[13]*Allen*, 28 Wn. App. at 649. *Accord, In re Stell*, 56 Wn. App. 356, 783 P.2d 615 (1989).

[14]*Allen*, 28 Wn. App. at 647 n.7.

[15]*See, e.g., In re Ramquist*, 52 Wn. App. 854, 862, 765 P.2d 30 (1988), *review denied*, 112 Wn.2d 1006 (1989); *In re Hansen*, 24 Wn. App. 27, 35, 599 P.2d 1304 (1979).

[16]Laws of 1990, ch. 284, § 1, p. 1606.

Not only does case law not support intervention of right in such situations, but Washington statutes do not establish an interest sufficient to support the foster parents' intervention as a matter of right. The statutes governing dependency actions[17] do create an expectancy on the part of the children, their legal parents and of the public that children will not be moved from any home at the mere whim of an agency. An agency's actions with respect to placement of a child in foster care are to be guided by the child's best interests and unnecessary changes in placement are to be avoided. The Legislature has recognized that "[p]lacement disruptions can be harmful to children by denying them consistent and nurturing support", RCW 74.13.310, and has enacted legislation requiring out-of-home placements to be selected "with a view toward the fewest possible placements for each child. If possible, the initial placement shall be viewed as the only placement for the child." RCW 74.13.290. While the child may benefit from these enactments, neither these statutes, nor others in effect at the time this action was initiated, grant *foster parents* a right to challenge arbitrary removal of children in foster care.[18]

In many cases foster parents who have provided a child a home for 90 days or more must be given at least 5 days'

---

[17]Statutes which govern court and agency actions involving children placed in foster care include the Basic Juvenile Court Act, RCW 13.04; the Juvenile Court Act in Cases Relating to Dependency of a Child and the Termination of a Parent and Child Relationship, RCW 13.34; the child welfare services and foster care acts, RCW 74.13 and RCW 74.15; the child abuse and neglect act, RCW 26.44; the interstate compact on placement of children, RCW 26.34; the adoption statute, RCW 26.33; the Indian Child Welfare Act of 1978, 25 U.S.C. § 1901 *et seq.*; and the Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. § 670 *et seq.* Additionally, the Juvenile Court Rules and Superior Court Civil Rules as well as numerous administrative regulations apply in all dependency cases.

[18]Laws of 1991, ch. 340, § 2, p. 1891 (effective May 21, 1991) requires DSHS to establish a grievance procedure that will be available to foster parents to challenge such removals. We are advised by counsel that such a procedure was established by the agency as of March 1, 1991.

advance notice of any proposed move of the child.[19] The statute is clear, however, that the notice provision is *not* intended to *require* a court hearing prior to a change in foster placement and that it is not intended to create any substantive *custody* rights in the foster parents.[20] Recent legislative efforts to expand the rights of foster parents would have required written notice to foster parents stating the reasons for removing a child from the foster home. The law also would have created a right to administrative review of the removal decision. The vote to adopt this legislation was unanimous in both the State Senate and the House of Representatives; however, the sections of the legislation that created such rights in foster parents were vetoed by the Governor.[21] We cannot reasonably conclude that the existing statutes go further than the Legislature's attempted express amendment by holding that existing statutes grant a right to judicial review upon the request of foster parents.

The foster parents thus do not have a legal interest sufficient to mandate intervention in the dependency action under CR 24(a)(2), governing intervention *as a matter of right*.

■ ■ It is true that in the situation presented some juvenile court judges may have granted *permissive intervention* and allowed the foster parents to challenge the move from their home to another foster home. Foster parents' intervention rights are limited, however, and intervention would be appropriate only to the extent that the rights of the foster parents and the rights of the legal

---

[19]RCW 74.13.300(1). The statute does not require notice in cases where: an immediate change in placement is ordered by the court; the child is being returned home; the child's safety is in jeopardy; or the child is residing in a receiving or group home.

[20]RCW 74.13.300(3).

[21]Laws of 1991, ch. 326, § 16, p. 1761. An administrative review is available under Laws of 1991, ch. 340, § 2, p. 1891.

parents do not conflict.[22] Any such decision permitting intervention is within the juvenile court's informed discretion and as an appellate court we must review such decisions under an abuse of discretion standard.[23] " 'An abuse of discretion exists only when no reasonable person would take the position adopted by the trial court.' "[24] Based on the meager record before us, we are unable to conclude that the juvenile court abused its discretion in denying the foster parents' motion to intervene.

ISSUE TWO.

CONCLUSION. Under Washington law as it exists at this time, foster parents do not have a liberty interest in the continuation of the foster parent/foster child relationship such that they are entitled to procedural due process before foster children can be removed from their foster home.

The foster parents also vigorously argue that they, as the psychological parents of J.H. and C.H., have a liberty interest in their family's privacy and in their family's continuation and, based on constitutional principles, their family should not have been disrupted without being accorded due process of law.

■ The weight of legal authority is contrary to the foster parents' contentions in this regard. Due process of law is not applicable unless the foster parents are being deprived

---

[22]*See, e.g., In re Maurer*, 12 Wn. App. 637, 530 P.2d 1338 (1975) and *In re Schulz*, 17 Wn. App. 134, 561 P.2d 1122 (1977) (establishing the right of grandparents to intervene on the issue of placement after the parents' rights have been terminated); *In re Coverdell*, 30 Wn. App. 677, 637 P.2d 991 (1981) and *In re Coverdell*, 39 Wn. App. 887, 696 P.2d 1241 (foster parents should not be permitted to intervene and participate in a dependency action when the legal rights of the parents and foster parents conflict), *review denied*, 102 Wn.2d 1009 (1984).

[23]*State ex rel. Keeler v. Port of Peninsula*, 89 Wn.2d 764, 767, 575 P.2d 713 (1978).

[24]*Board of Regents v. Seattle*, 108 Wn.2d 545, 557, 741 P.2d 11 (1987) (quoting *Griggs v. Averbeck Realty, Inc.*, 92 Wn.2d 576, 584, 599 P.2d 1289 (1979)).

of something to which they have a right.[25] Therefore, we must first determine whether the claimed right or interest to be protected is within the Fourteenth Amendment's protection of liberty or property.[26]

"Liberty" is a flexible term that

denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness by free men." *Meyer* v. *Nebraska*, 262 U. S. 390, 399[, 67 L. Ed. 2d 1042, 43 S. Ct. 625, 29 A.L.R. 1446 (1923)]. In a Constitution for a free people, there can be no doubt that the meaning of "liberty" must be broad indeed.

*Board of Regents v. Roth*, 408 U.S. 564, 572, 33 L. Ed. 2d 548, 92 S. Ct. 2701 (1972).

It is unquestioned that biological and adoptive parents do have a fundamental liberty and privacy interest in the care, custody and management of their children.[27] The parents' right to custody of their children is described as being rooted in the natural and the common law,[28] and as being a sacred right that is more precious than the right to life itself.[29] Without question, the legal parents have a con-

---

[25]*See, e.g., Yantsin v. Aberdeen*, 54 Wn.2d 787, 788, 345 P.2d 178 (1959).

[26]*Board of Regents v. Roth*, 408 U.S. 564, 571, 33 L. Ed. 2d 548, 92 S. Ct. 2701 (1972).

[27]RCW 13.04.011(4) (defining "parent"); RCW 26.33.260 (effect of adoption decree is to make the adoptee the legal equivalent of a biological child); *Smith v. Organization of Foster Families for Equality & Reform*, 431 U.S. 816, 843 n.51, 53 L. Ed. 2d 14, 97 S. Ct. 2094 (1977); *Stanley v. Illinois*, 405 U.S. 645, 651-52, 31 L. Ed. 2d 551, 92 S. Ct. 1208 (1972); *In re Luscier*, 84 Wn.2d 135, 136, 524 P.2d 906 (1974).

[28]*In re Hudson*, 13 Wn.2d 673, 678, 126 P.2d 765 (1942).

[29]*Luscier*, 84 Wn.2d at 137; *In re Myricks*, 85 Wn.2d 252, 253-54, 533 P.2d 841 (1975); *In re Sumey*, 94 Wn.2d 757, 762, 621 P.2d 108 (1980).

stitutional right to procedural due process in cases where a child is involuntarily removed from the parents' care.[30]

The foster parents here claim that as psychological parents they too should be accorded constitutional protection. In *Smith v. Organization of Foster Families for Equality & Reform*, 431 U.S. 816, 847, 53 L. Ed. 2d 14, 97 S. Ct. 2094 (1977) (*OFFER*), the United States Supreme Court observed that a foster parent's "claim to a constitutionally protected liberty interest raises complex and novel questions." In *OFFER*, the Court discussed the interest of foster parents in continuing their relationship with their foster children but found it unnecessary to decide whether a liberty interest existed because the preremoval hearing procedure examined in that case satisfied any due process rights the parties might have had.

*OFFER* holds that because the "family" created by a foster placement has its basis in a contractual relationship governed by state law, state law must be the source for determining any expectations and entitlement of the parties.[31]

Some courts in this nation have determined that statutory provisions authorizing participation of foster parents in dependency actions, or requiring notice to foster parents, contemplate an opportunity to be heard and have on that basis allowed foster parents to participate in juvenile court actions.[32] Most courts faced with the issue, however, have determined that a liberty interest in the continuation of the foster family relationship either does not arise or else is exceptionally limited; such holdings are primarily

---

[30]*Myricks*, 85 Wn.2d at 254; *In re Hagen*, 21 Wn. App. 169, 173, 584 P.2d 446 (1978).

[31]*OFFER*, 431 U.S. at 845-46.

[32]*See, e.g., Doe v. Department of Human Servs.*, 165 N.J. Super. 392, 398 A.2d 562 (1979); *Christina K. v. Superior Court*, 184 Cal. App. 3d 1463, 229 Cal. Rptr. 564 (1986) (foster parents who also are the psychological or de facto parents of child have a limited right to participate in dependency and termination proceedings).

predicated on the temporary or transitional nature of foster care.[33]

We too look to our state law to determine this state's purpose for foster care as well as for any substantive statutory provisions that may trigger a liberty interest.

Our Legislature has only recently authorized the limited participation of foster parents in juvenile court dependency disposition hearings.[34] This participation is discretionary with the juvenile court and is "for the sole purpose of providing information about the child to the court."[35]

As previously noted, a Washington statute also requires that in certain circumstances 5 days' advance notice be given to foster parents before a child is removed from the foster home. This notice requirement arises only if the child has been in the home for 90 days and does not apply to receiving homes or group homes. This statutory right also does not apply if the child is being returned to the home of his or her legal parents, if the child's safety is in jeopardy, or if the court has ordered the change in placement.[36] The notice requirement is further expressly limited by the following provision:

> This section is intended solely to assist in minimizing disruption to the child in changing foster care placements. *Nothing in this section shall be construed to require that a court hearing be held prior to changing a child's foster care placement nor to create any substantive custody rights in the foster parents.*

(Italics ours.) RCW 74.13.300(3).

---

[33]*See, e.g., Drummond v. Fulton Cy. Dep't of Family & Children's Servs.*, 563 F.2d 1200 (5th Cir. 1977), *cert. denied*, 437 U.S. 910, 57 L. Ed. 2d 1141, 98 S. Ct. 3103 (1978) (interpreting Georgia law); *Renfro v. Cuyahoga Cy. Dep't of Human Servs.*, 884 F.2d 943 (6th Cir. 1989) (interpreting Ohio law); *Kyees v. County Dep't of Pub. Welfare*, 600 F.2d 693 (7th Cir. 1979) (interpreting Indiana law). *See also* Annot., *Status and Rights of Foster Children and Foster Parents Under Federal Constitution*, 53 L. Ed. 2d 1116 (1978 & Supp. 1990).

[34]Laws of 1991, ch. 340, § 3, p. 1892.

[35]Laws of 1991, ch. 340, § 3, p. 1892.

[36]RCW 74.13.300(1).

■ Our Legislature has thus not provided foster parents with any clear entitlement to procedural due process.[37] The nature of foster placements under Washington statutes remains temporary and transitional. In earlier amendments to the child welfare statutes, the Legislature found that "foster parents play an integral and important role in the system and particularly in the child's chances for the earliest possible reunification with his or her family."[38] Washington statutes and case law make it abundantly clear that the paramount goal of child welfare legislation is to reunite the child with his or her legal parents, if reasonably possible. At the present time, foster parents have not been accorded a statutorily recognized expectancy in a continued relationship between themselves and their foster children, even in instances where foster parents may in fact have become the "psychological parents" of the foster children.

The foster parents in this case also claim that a federal statute, the Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. § 670 *et seq.*, creates an expectancy of some permanency in the relationship between the child and the foster parents.

The federal act requires that procedural safeguards be afforded all children in foster care.[39] The act further requires that procedural safeguards be afforded parents with respect to certain agency decisions, such as the removal of a child from the parents' care, visitation privileges and changes in placement of the child.[40] Parent is defined in the act as the "biological or adoptive parents

---

[37]As noted earlier, the Legislature's recent attempt to expand the notice rights of foster parents was contravened by the Governor's veto of the specific sections defining foster parent rights. Laws of 1991, ch. 326, §§ 15, 16, p. 1761.

[38]Laws of 1990, ch. 284, § 1, p. 1606.

[39]42 U.S.C. § 675(5)(C).

[40]42 U.S.C. § 675(5)(C).

or legal guardians, as determined by applicable State law."[41]

Nothing in the federal act clearly affords foster parents a right to a hearing before children are removed from their care. We thus do not read the federal statute as establishing a liberty interest in foster parents' continued relationship with foster children in their care.

We therefore hold that, under the law as it now exists in this state, foster parents do not have a liberty interest sufficient to require procedural due process in the nature of a judicial hearing before foster children can be removed from their foster home.

ISSUE THREE.

CONCLUSION. The children in this case and their legal representatives were in fact afforded an opportunity for a hearing, thus we need not determine whether foster children are entitled to due process before being moved from one foster home to another.

The foster parents argue that the children, J.H. and C.H., were denied procedural due process when they were not afforded a hearing prior to their removal from the foster parents' home.

The Washington Legislature has determined that children involved in dependency and termination actions are parties to those actions and entitled to representation.[42] Children have a right to be represented by a guardian ad litem or an attorney or both,[43] who have the right to fully participate in all proceedings.[44]

■ We need not decide whether the children in this case had a constitutional right to challenge the move from the foster parents' home, as it appears that J.H. and C.H.

---

[41]42 U.S.C. § 675(2).

[42]RCW 13.34.100.

[43]RCW 13.34.100; JuCR 9.2(b)(1).

[44]RCW 13.34.090.

through their legal representative were afforded full opportunity to request that the court review the agencies' decision. Due process requires notice and an opportunity to be heard at a meaningful time and in a meaningful manner.[45] The record does not reflect when the children's representative was notified, but it is clear under the facts of this case that the children, through their guardian ad litem, were given the opportunity to challenge this change in placement but did not do so.[46]

The foster parents additionally ask that they be awarded attorneys' fees in this action based on public policy, as expressed in state and federal statutes, and based on fairness. In essence, they ask that we create "an equitable exception" to the general rule that the court has no authority to award attorneys' fees "[i]n absence of contract, statute, or recognized ground of equity".[47] We decline the invitation to create such an exception and the foster parents' request for fees must, therefore, be denied.

To the extent that the appellate briefs suggest other arguments and possible assignments of error, we do not consider them persuasive.

In sum: foster parents are not entitled, as a matter of right, to intervene in juvenile dependency proceedings; the record before us is insufficient to establish that the juvenile court abused its discretion in denying them permissive intervention; and the limits imposed by present state and federal statutes, and the legal nature of the foster care relationship in the state of Washington, are

---

[45]*Diedrick v. School Dist. 81*, 87 Wn.2d 598, 606, 555 P.2d 825 (1976).

[46]A guardian ad litem was appointed to represent the children's interests at least as early as October 1989, and was present at the hearing before this court, though declined the opportunity to be heard. The position of the children in this case has nowhere in the record before us been articulated by the guardian ad litem.

[47]*State ex rel. Macri v. Bremerton*, 8 Wn.2d 93, 113-14, 111 P.2d 612 (1941); *Dauphin v. Smith*, 42 Wn. App. 491, 494, 713 P.2d 116 (1986)..

such that foster parents do not have a liberty interest sufficient to trigger constitutional due process guaranties.

The juvenile court is affirmed.

DORE, C.J., and UTTER, BRACHTENBACH, DOLLIVER, DURHAM, SMITH, GUY, and JOHNSON, JJ., concur.