[No. 57557-1-I.   Division One.   April 30, 2007.]

*In the Matter of the Adoption of* R.L.M.

MONESA SUNDERLAND, *Appellant*, v. THE DEPARTMENT OF SOCIAL AND HEALTH SERVICES ET AL., *Respondents*.

278

*Leonard J. Feldman* and *Matthew A. Carvallo* (of *Heller Ehrman, LLP*), for appellant.

*Robert M. McKenna, Attorney General*, and *Scott Majors* and *Christian Williams, Assistants*, for respondent Department of Social and Health Services.

*Linda E. Passey* (of *Law Office of Linda Passey*), for respondent adoptive parents.

¶1 AGID, J. — R.L.M. is a seven year old girl. Monesa Sunderland is her paternal aunt. When R.L.M. was four years old, the Department of Social and Health Services (DSHS) removed her from her parents and placed her with Sunderland. DSHS later removed R.L.M. from Sunderland because of her drug use and placed the child with a foster-adopt family. Sunderland completed a drug recovery program and parenting classes and sought to adopt R.L.M. R.L.M.'s foster parents also petitioned for adoption. Sunderland was given only three hours notice of the competing adoption hearing, and neither she nor her attorney could attend the hearing. An associate of her attorney asked that Sunderland be given an opportunity to present evidence that it was in R.L.M.'s best interests to be adopted by her rather than the foster parents. The superior court denied this request and granted the other adoption petition. Sunderland argues that the court erred by denying her right to notice and a hearing and by denying permissive intervention under CR 24(b). We hold that Sunderland had no statutory or due process right to notice and a hearing because she was not R.L.M.'s parent, legal guardian, or de facto parent. We decline to consider Sunderland's permissive intervention argument because a mere procedural error is an insufficient basis for challenging a finalized adoption decree under RCW 26.33.260(3).

## FACTS

¶2 R.L.M. was born on October 18, 1999. DSHS removed her from her mother based on allegations of drug use and neglect. At the time, her father was incarcerated on drug charges. Monesa Sunderland is R.L.M.'s paternal aunt and claims she helped to raise the child from birth. In March

2004, DSHS placed R.L.M. with Sunderland after removing her from her mother. On February 22, 2005, R.L.M.'s parents' parental rights were terminated, and DSHS became her legal guardian. Around January 2005, Sunderland began using methamphetamine after she and her longtime partner separated. When DSHS found out about the drug use, it required her to sign an agreement to stop using drugs and submit to random drug testing. She signed the agreement but later tested positive for drugs. On March 1, 2005, DSHS removed R.L.M. from Sunderland because of her drug use and placed R.L.M. with a foster-adopt family. Sunderland immediately entered a drug treatment program. She completed the intensive out-patient phase in May 2005 and continued her recovery with aftercare and support groups. She also took parenting classes because she hoped to regain custody of R.L.M.

### Competing Adoption Petitions

¶3 After completing her drug rehabilitation program and parenting classes, Sunderland sought to become R.L.M.'s permanent placement. On September 28, 2005, Sunderland moved to intervene in R.L.M's pending dependency case. A commissioner granted her intervenor status and set a noncontested adoption review for October 31, 2005. On October 13, 2005, R.L.M.'s foster parents filed a petition to adopt R.L.M. They did not serve Sunderland with their petition. On October 17, Sunderland completed a preplacement adoption report in preparation to petition to adopt R.L.M. On October 26, 2005, the superior court entered an order reversing the commissioner's decision and denying Sunderland intervention because it found that allowing her party status in the dependency was not in R.L.M.'s best interests.

¶4 On November 9, 2005, Sunderland also filed a petition to adopt R.L.M., without the necessary DSHS consent required under RCW 26.33.160. She included her preplacement report with this filing. The report conditionally recommended Sunderland as an adoptive parent, stating that

she would be a suitable permanent placement for R.L.M. provided that she "continue in the recovery lifestyle she has applied since her treatment seven months ago, including parenting work, counseling and relocating out of her neighborhood." Sunderland was unable to file the necessary postplacement report because R.L.M. had not lived with her since March 2005.

¶5 On November 10, 2005, DSHS filed its consent to adoption by the foster family, waiver of right to notice of any further hearings related to the adoption, and preplacement and postplacement reports recommending R.L.M.'s foster family adopt her. That same day, R.L.M.'s foster-adopt parents filed a calendar note setting the adoption hearing for November 21, 2005. They did not serve Sunderland with notice of this hearing.

¶6 On the morning of November 21, 2005, the hearing on the foster parents' adoption petition began. At the hearing, the court became aware of the competing adoption petition Sunderland had filed and decided to set the hearing over until 3:20 PM to give Sunderland a chance to appear before the court. Counsel for the foster parents called Sunderland's attorney at 12:10 PM and left a message about the afternoon hearing. Sunderland's attorney was on vacation but his associate, Ruth Westbrook, arranged to appear by telephone. Neither Sunderland nor her attorney was able to attend the afternoon hearing. At that hearing, Westbrook asked for a continuance and joinder of the two adoption proceedings. She also asked the court to permit Sunderland to intervene in the competing adoption proceeding.[1] The court denied Sunderland's requests and granted the foster parents' adoption petition. On December 6, 2005, Sunderland moved for reconsideration of the adoption decision and submitted a memorandum about her objections to the proposed order. On December 7, 2005, the trial court entered its final order granting the adoption. Sunderland appeals.

---

[1] DSHS and the adoptive parents contest this finding, claiming that the reference to intervention in the minute entry is a scrivener's error.

## DISCUSSION

### I. *Motion To Correct Sunderland's Brief under RAP 10.7*

■ ¶7 We must initially determine whether to grant DSHS' motion to correct Sunderland's brief under RAP 10.7, requesting that all references in her brief to material not in the record be stricken. Sunderland's brief repeatedly references the transcript from the dependency hearing, at which the superior court denied Sunderland's motion for permissive intervention in R.L.M.'s dependency proceedings. This transcript is not part of the record. RAP 10.3(a)(5) requires that all factual statements must be supported by reference to the record. Sunderland's reference to a document not in the record violates this rule.

■ ¶8 Sunderland argues that we should consider the additional dependency proceeding evidence under RAP 9.11, but did not formally move to add the evidence under the rule. RAP 9.11 allows this court to consider additional evidence if it is necessary to "fairly resolve the issues on review." Here, the trial court was aware that the superior court denied intervention on revision. In fact, the trial court explicitly based its decision not to join the two adoption petitions partly on the order in the dependency case denying Sunderland intervention. Because the additional evidence offered is not necessary to the resolution of this case, we need not decide whether it could be considered under RAP 9.11.

■ ¶9 Sunderland also contends that this court should take judicial notice of the dependency transcript because the dependency proceeding is "engrafted, ancillary, or supplementary" to the adoption proceeding.[2] The Supreme Court rejected this argument in *In re Adoption of B.T.*[3] It refused to take judicial notice of the records from B.T.'s earlier dependency proceedings because an adoption and a

---

[2] *See Swak v. Dep't of Labor & Indus.*, 40 Wn.2d 51, 53, 240 P.2d 560 (1952).

[3] 150 Wn.2d 409, 78 P.3d 634 (2003).

dependency action are "two separate judicial proceedings."[4] We decline to take judicial notice of the dependency transcript.

¶10 RAP 10.7 grants this court the discretion to order correction of a brief or accept it without considering the erroneous references. We deny DSHS' motion to correct appellant's brief. We have not considered and do not need to consider the erroneously cited dependency proceeding transcript because there is ample evidence of what occurred at that proceeding in the record properly before us, and further consideration of the dependency proceedings is not necessary to resolve the issues on appeal.

## II. *Procedural Challenge to the Adoption Decree*

[5, 6] ¶11 DSHS argues that Sunderland cannot appeal the decree of adoption based on the issues she raises. The legislature intended that an adoption decree "provide finality for adoptive placements and stable homes for children."[5] To that end, the legislature has limited the grounds for challenging an adoption on appeal.[6] RCW 26.33.260(3) states that:

> Except as otherwise provided in RCW 26.33.160(3) and (4)(h), no person may challenge an adoption decree on the grounds of:
>
> (a) A person claiming or alleging paternity subsequently appears and alleges lack of prior notice of the proceeding; or
>
> (b) The adoption proceedings were in any other manner defective.

There is no case law interpreting RCW 26.33.260(3), but no interpretation is necessary to conclude that it prohibits challenges to finalized adoptions based on a procedural error. We therefore hold that Sunderland's claim that the superior court erred by denying permissive intervention is insufficient to challenge the adoption, and we decline to consider it.

---

[4] *Id.* at 415.

[5] RCW 26.33.260(4).

[6] RCW 26.33.260.

### III. *Due Process Challenge to the Adoption Decree*

■■ ¶12 Sunderland's other claim is that she was denied procedural due process, which is guaranteed by both our federal and state constitutions.[7] The legislature cannot limit the constitutional rights of its citizens by statute.[8] We hold that a party alleging a constitutional violation necessarily presents sufficient grounds for challenging an adoption decree under RCW 26.33.260.

■■ ■■ ¶13 "Because the process of adoption is a creature of statute, the adoption statutes must be strictly followed."[9] Under RCW 26.33.240, the only people or agencies entitled to notice of an adoption hearing are those whose consent to the adoption is required under RCW 26.33.160, those who prepared the preplacement report, and, if the child falls within the definition of an Indian child, her tribe. Under RCW 26.33.160(1), the only relatives whose consent is required for adoption, and who are consequently entitled to notice, are the child's parents, the alleged father of a minor child, or a relative who is also the child's legal guardian.

■■ ¶14 But adoption is not so technical that the trial court is left without the power to allow intervention of interested parties or to conduct an evidentiary hearing before granting or denying an adoption petition.[10] In *B.T.*, the Washington Supreme Court held that grandparents who had properly obtained intervenor status in their grandchild's dependency action were entitled to notice and an opportunity to be heard on a competing adoption petition. The court also observed in a footnote that nonparental relatives are not entitled to notice of an adoption proceeding

---

[7] U.S. CONST. amend. XIV, § 1; WASH. CONST. art. I, § 3.

[8] *See Seattle Sch. Dist. No. 1 v. State*, 90 Wn.2d 476, 503, 585 P.2d 71 (1978).

[9] *B.T.*, 150 Wn.2d at 416 (citing *In re Adoption of Henderson*, 97 Wn.2d 356, 358, 644 P.2d 1178 (1982)).

[10] *Id.* (citing *In re Adoption of Baby Girl Doe*, 45 Wn.2d 644, 649, 277 P.2d 321 (1954)).

solely by virtue of their biological ties to the adoptee.[11] This court and the Supreme Court have also recognized limited situations where a person in a quasi-parental relationship to a child is entitled to procedural due process.[12]

¶15 Sunderland argues that she should have received more than three hours notice of the competing adoption hearing and should have been given a chance to present evidence that adoption by her, rather than R.L.M.'s foster parents, was in R.L.M.'s best interests. Clearly, Sunderland is not entitled to statutory notice under RCW 26.33.240, since she is not R.L.M.'s parent or legal guardian. And her familial tie to R.L.M. grants her no special legal status.[13] Sunderland had intervenor status at the time R.L.M.'s foster parents filed their adoption petition and, therefore, should have received notice of the petition.[14] But, because the superior court later denied intervention on revision, Sunderland was no longer entitled to notice when the court set the date for the foster parents' adoption hearing.

¶16 Sunderland's argument hinges on her claim that she is entitled to procedural due process as R.L.M's psychological parent. She relies on several decisions granting non-parents procedural due process in actions involving the custody of children based on their quasi-parental relationships to the affected children. In *In re Welfare of Hansen*, we held that due process considerations require courts to give parties who stand in loco parentis to a child a full and meaningful opportunity to present evidence at a hearing to determine the child's status as a dependent child.[15] In *In re Dependency of J.W.H.*, the Supreme Court held that temporary custodians who were petitioning for permanent

---

[11] *Id.* at 419 n.5.

[12] *In re Dependency of J.W.H.*, 147 Wn.2d 687, 701, 57 P.3d 266 (2002); *In re Welfare of Hansen*, 24 Wn. App. 27, 36, 599 P.2d 1304 (1979).

[13] *B.T.*, 150 Wn.2d at 419 n.5.

[14] *See id.*

[15] 24 Wn. App. 27, 36, 599 P.2d 1304 (1979).

custody of the children and had obtained intervenor status in the dependency action were entitled to due process.[16] Most recently, in *In re Parentage of L.B.*, the Supreme Court held that a "de facto parent" has a fundamental right, equal to that of a biological or adoptive parent, in the care and custody of a child.[17]

¶17 Sunderland's situation is factually and legally distinguishable from all of the cases granting procedural due process rights to nonparents. In *Hansen*, the appellants had cared for the child since she was less than one year old and had been her legal guardians for eight years before the child's biological mother sought to regain custody by petitioning for termination of the guardianship.[18] And it was they who filed the petition to declare the child dependent, in an effort to thwart the mother's efforts to regain custody.[19] Thus, they were seeking only the right to present evidence, at the proceedings they instituted, to ensure that the child they raised was not placed with the mother who had abandoned her. In *J.W.H.*, the children's parents voluntarily placed them with their aunt and uncle while the parents participated in a drug rehabilitation program.[20] When the aunt and uncle found out about the sexual abuse the children had suffered, they petitioned for nonparental custody of the children and were granted temporary custody before the state instituted dependency proceedings.[21] They successfully sought intervention of right in the dependency ac-

---

[16] 147 Wn.2d 687, 701, 57 P.3d 266 (2002).

[17] 155 Wn.2d 679, 710, 122 P.3d 161 (2005), *cert. denied*, 547 U.S. 1143 (2006). Appellant does not claim de facto parent status. Instead, she claims she is entitled to procedural due process because she is R.L.M.'s psychological parent. She cites *L.B.* solely for its statement that Washington courts have recognized that psychological parent status exists, but the case grants no special legal rights to psychological parents. 155 Wn.2d at 691-92.

[18] 24 Wn. App. at 29-30.

[19] *Id.* at 30-31.

[20] 147 Wn.2d at 690.

[21] *Id.* at 693.

tion.[22] The trial court later refused to allow them to present evidence against the dependency, which they asserted would result in reunifying the children with the parents who abused them.[23] Thus, they were already parties to the proceeding when they appealed. In *L.B.*, the person seeking custody was the partner of the child's biological mother, with whom she had jointly decided to conceive and raise L.B.[24] And the appellant had raised L.B. as her daughter for six years before she and L.B.'s biological mother separated.[25]

¶18 Clearly, the appellants in *J.W.H.* and *Hansen* were in much better positions procedurally than Sunderland, having both been granted legal custodial rights to the children in whose proceedings they were seeking to participate. And, in both cases, the children were still living with the appellants. In contrast, Sunderland has never been R.L.M.'s legal guardian or custodian, and DSHS removed R.L.M. from her care eight months before the adoption hearing. No court has determined that placement with Sunderland was in R.L.M.'s best interests.[26] DSHS initially placed R.L.M. with Sunderland as a relative foster care placement. Foster parents have no due process right to participate in proceedings determining the custody of children placed in their care, even if they have become a child's psychological parent.[27] While the trial court could have allowed Sunderland to intervene,[28] thus giving her the right to notice and an opportunity to participate under *B.T.*,

---

[22] *Id.*

[23] *Id.* at 693-94.

[24] 155 Wn.2d at 682.

[25] *Id.*

[26] *See* RCW 26.10.100 (Nonparental custody is determined based on the best interests of the child.); *see also* RCW 13.34.231(6) (Guardianship is determined based on the best interests of the child.).

[27] *In re Dependency of J.H.*, 117 Wn.2d 460, 476-77, 815 P.2d 1380 (1991).

[28] *B.T.*, 150 Wn.2d at 419 n.5.

she was ultimately unsuccessful in her attempt to intervene in R.L.M.'s dependency.

¶19 Procedural due process applies only in situations where a person is being deprived of something to which she has a right.[29] Because Sunderland had no legally-recognized interest in the custody of R.L.M. and no right to intervene in the adoption proceedings, she would be entitled to due process only if she could show that she was R.L.M.'s de facto parent.

¶20 *L.B.* lays out a four part test for determining whether someone is a child's de facto parent: (1) the child's legal parent "consented to and fostered the parent-like relationship" between the child and the alleged de facto parent; (2) the child lived with the person claiming de facto parent status; (3) the person assumed parental obligations without expectation of financial compensation; and (4) the person has "been in a parental role for a length of time sufficient to have established . . . a bonded, dependent relationship" with the child.[30]

¶21 The record does not support considering Sunderland to be R.L.M.'s de facto parent. Although Sunderland claims to have been involved in R.L.M.'s life from birth, the child lived with her for only one year. There is no evidence to suggest that R.L.M.'s biological parents intentionally fostered a parent-like relationship between R.L.M. and Sunderland. Despite two declarants' statements that Sunderland regularly checked up on R.L.M., bought her clothes and toys, planned her birthday parties, took her to her first day of school, and regularly cared for her for days at a time, there is no evidence that Sunderland lived with R.L.M. before she was declared a dependent child. On the contrary, DSHS removed R.L.M. from her mother's home. In *In re Dependency of D.M.*, we recently held that an aunt and uncle who were adjudicated nonparental custodians of two children after their mother abandoned them, but later lost

---

[29] *J.H.*, 117 Wn.2d at 472-73.

[30] 155 Wn.2d at 708.

custody of the children based on allegations of abuse, had no right to participate in the hearing to terminate the children's mother's parental rights because they were not de facto parents.[31] We explained that mere "passive acquiescence" by the biological parent is insufficient to meet the first prong of the de facto parent test, which requires that the parent consent to and foster the parent-like relationship.[32] Similarly, Sunderland cannot show that her occasional care of R.L.M. was the result of the child's parents actively fostering a parent-like relationship rather than them merely permitting Sunderland to help out with R.L.M. because their drug problems prevented them from properly caring for her. We hold that Sunderland is not R.L.M.'s de facto parent and, therefore, had no procedural due process right to participate in the competing adoption hearing.

¶22 We recognize that the current statutes and case law leave family members seeking to adopt children with whom they may have strong biological and social ties without a remedy in the face of a competing adoption petition by a nonfamily member who has received consent from DSHS. Under the current law, in the absence of a formal court order granting them custody or guardianship of the child, these nonparental relatives must either have de facto parent status or successfully obtain permissive intervention in the dependency proceedings in order to get notice and an ability to meaningfully participate in a hearing that will forever foreclose their ability to adopt the child. While we understand the difficult position in which this decision places family members seeking to adopt, this is an issue

---

[31] 136 Wn. App. 387, 398, 149 P.3d 433 (2006).

[32] *Id.* at 397.

that must be resolved by the legislature, not the appellate court.

¶23 We affirm.

BAKER and ELLINGTON, JJ., concur.

Review denied at 162 Wn.2d 1023 (2008).