# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| In the Matter of the Adoption of:<br><br>M.J.W.,<br><br>                       a minor child. | No.  50758-7-II<br><br><br>PUBLISHED OPINION |

LEE, A.C.J. — Greg and Linda Minium appeal the trial court's denial of their petition to adopt their minor grandson, M.J.W.  The Miniums argue that the trial court erred in allowing M.J.W.'s paternal grandmother, Patti Shmilenko, to intervene in the adoption proceedings because Patti[1] had not petitioned to adopt M.J.W. herself.  The Miniums also argue that the trial court abused its discretion in denying their adoption petition because its ruling was based on speculation and an erroneous finding that the adoption petition might impact an agreed residential schedule order between the Miniums and Patti.

We agree that the trial court erred in allowing Patti to intervene in the adoption proceeding as a matter of right, but we hold that the trial court did not abuse its discretion in allowing Patti to intervene permissively.  We also hold that the trial court did not abuse its discretion in finding that adoption by the Miniums was not in M.J.W.'s best interests.  Accordingly, we affirm.

---

[1] Because multiple persons in this case share the last name Shmilenko, we refer to them individually by their first names and collectively as the Shmilenkos.  We mean no disrespect.

FACTS

A.    PROCEDURAL BACKGROUND

M.J.W.'s parents were killed by a drunk driver in 2008, just days before his first birthday. At the time of the accident, M.J.W. was under the care of his maternal grandparents, Linda and Greg Minium.[2]

A month following the accident, the Miniums petitioned for custody of M.J.W.  The paternal grandparents, Patti and John Shmilenko, filed a response requesting regular visitation with M.J.W.  Tension ensued between the Miniums and Shmilenkos, but they agreed to a residential schedule order in 2010.

The trial court entered the agreed residential schedule order, which provided that M.J.W. would reside with the Miniums, as nonparental custodians, but would spend every Tuesday and Thursday from 1:00 pm to 7:00 pm, and alternating weekends, with Patti until the age of five.  The 2010 residential schedule order also provided that M.J.W. would split holidays, vacations, and special occasions between the Miniums and Patti.

After agreeing to the 2010 residential schedule order, the Miniums attempted to limit the Shmilenkos' access to M.J.W., and Greg tried to "have the 2010 order thrown out of court."  1 Verbatim Report of Proceedings (VRP) (June 6, 2017) at 135.  The Miniums also refused to discuss modification of the agreed order. And they refused mediation as required by the order.  Patti filed

---

[2] Because multiple persons in this case share the last name Minium, we refer to them individually by their first name and collectively as the Miniums.  We mean no disrespect.

suit to modify the agreed order, and the Minimums responded by filing a motion to vacate the order. The trial court denied this motion.

In September 2014, the Miniums filed a petition to adopt M.J.W. Patti filed a motion to intervene in the adoption proceedings on October 3. Patti argued that she could intervene as a matter of right under CR 24(a) in order to protect her "legally cognizable rights with regard to the parenting of [M.J.W.]." Clerk's Papers (CP) at 194. She also argued that she could permissively intervene under CR 24(b) because her rights under the 2010 residential schedule shared a common question of law or fact to the adoption petition, which was determining the best interests of M.J.W. The trial court granted Patti's motion to intervene both as a matter of right and by permissive intervention.

While the Miniums' petition to adopt M.J.W. was pending, the Miniums and the Shmilenkos entered into a modified residential schedule order on October 31, 2014. This order provided that M.J.W. would visit with Patti on Tuesdays during the school year between 4:00 pm and 6:30 pm, and would spend one to two weekends per month with Patti. Again, the residential schedule order provided that M.J.W. would split his winter vacation, spring break, and summer holiday between the Miniums and Patti. And M.J.W. would spend alternating holidays and special occasions with the Miniums and Patti. There were no missed visits under the 2010 and 2014 residential schedule orders.

B.     ADOPTION TRIAL

A trial was held on the merits of the Miniums' adoption petition in June 2017. Several family members and expert witnesses testified at trial.

Richard Dillman, a licensed mental health counselor in Washington, testified that he began treating M.J.W. for anxiety in January 2015. As part of his treatment, Dillman initially met with M.J.W. and Linda together. During these visits, Linda mentioned adoption to Dillman, discussed her litigation with Patti, and once accused Patti of drug use. At Linda's request, Dillman wrote a letter stating that the Shmilenkos had forced overnight visits on M.J.W., which had caused M.J.W.'s anxiety. As a result of these discussions, Dillman developed a very negative view of the Shmilenkos. Dillman later met the Shmilenkos and determined that he had developed an erroneous view of them based on his discussions with Linda.

Dillman also testified that he had offered to act as a mediator between the Miniums and the Shmilenkos because he believed that the antipathy between the parties was negatively impacting M.J.W. The Shmilenkos were willing to go to mediation, but the Miniums were not.

During trial, Patti asked Dillman whether he believed the adoption might impact the visitation schedule in effect between Patti and the Miniums. The trial court overruled the Miniums' objection that such testimony would be speculative, and Dillman testified that absent a court order, "the potential for [visitation] to change would definitely be there." 6 VRP (June 14, 2017) at 763. He also testified that based on the "antipathy" between the Miniums and the Shmilenkos, M.J.W. would visit with the Shmilenkos far less frequently if the Miniums' adoption petition was granted.

Jami Pannell, the guardian ad litem appointed by the trial court to represent M.J.W.'s interests in this case, also testified. The trial court had ordered Pannell to investigate all matters related to the parenting plan, including financial stability, emotional stability, home life, and

whether M.J.W. had social and "familiar" support under the current plan. 5 VRP (June 13, 2017) at 687.

Pannell testified that during her investigation, Linda stated that Patti was manipulative, controlling, and unable to provide proper oversight for M.J.W. Pannell also noted that while exchanging M.J.W. between their homes, the Miniums would refuse to smile at, look at, or speak to the Shmilenkos. The tension during these exchanges caused M.J.W. to develop stomachaches.

Based on her interviews with the Miniums and the Shmilenkos, Pannell found that the Shmilenkos had acted as "peacekeepers" in this case. 5 VRP (June 13, 2017) at 687. The Shmilenkos attempted to hire a mediator and had received counseling on how to keep peace with the Miniums. And M.J.W. had a very strong bond with both Patti and John. Pannell determined that regular visitation with the Shmilenkos would be in M.J.W.'s best interests. Pannell reported that the Shmilenkos played a vital role in M.J.W.'s emotional health and wellbeing, and opined that they should not be excluded from his upbringing.

Pannell was concerned that the Miniums might try to limit Patti's access to M.J.W. Patti specifically asked Pannell whether she had concerns about the adoption, and Pannell testified that she was concerned that Patti might be left out of M.J.W.'s life if the Miniums' adoption petition was granted. The Miniums objected to this testimony as speculation, but the trial court overruled their objection.

Linda testified that Patti was a harmful and negative influence on M.J.W., and claimed that Patti knew no bounds, was domineering, condescending, and disrespectful. Greg testified that Patti was an " 'evil woman,' " and acknowledged that he would follow the 2014 residential

schedule " 'with a grudge.' " CP at 481-82. Greg also admitted that he previously tried to "have

the 2010 [residential scheduling] order thrown out of court." 1 VRP (June 6, 2017) at 135. Other

witnesses that testified at trial all agreed that the 2014 residential schedule was in M.J.W.'s best

interest.[3]

The trial court found that M.J.W. needed both the Miniums and the Shmilenkos in his life.

M.J.W.'s current living situation "ha[d] continuity, consistency, and stability," and M.J.W. was

"thriving under the 2014 Residential Schedule." CP at 481. The court also found that the titles of

" 'adopted' " and " 'legal parent' " would have no positive emotional or developmental effect on

M.J.W. CP at 481. The court further found that the loss of M.J.W.'s relationship with either the

Shmilenkos or the Miniums would impede M.J.W.'s development and harm his wellbeing. CP at

481.

Based on the Miniums' "concrete, unchanging negative views" of Patti, the trial court

concluded that Patti's visitation with M.J.W. would be diminished or cease altogether if the trial

court were to grant the Miniums' adoption petition. CP at 481. This would upset the status quo

that had been so critical to M.J.W.'s development. The court also concluded that adoption posed

a grave risk to the status quo established under the 2014 residential schedule because adoption

---

[3] Kimberly French, M.J.W.'s preschool teacher; Karen Roggenkamp, a longtime friend of the Miniums; Emily Schloss, the Miniums' adult daughter; Blaine Tolby, M.J.W.'s pediatrician; Trisha West, M.J.W.'s kindergarten teacher; Keith Lawrence, who conducted an adoption placement report in this case; John, Patti's husband; Emily Anderson, Patti's niece-in-law; Leah Brown, Patti's former stepdaughter; Landon Poppleton, a psychologist; Chelsea Baldwin, one of Patti's former attorneys; Barbara Kivela, Patti's sister; Stacy Tucker, whose half-sister's father was once married to Patti; and Christen Carson, a clinical and forensic psychologist, also testified at trial.

divests anyone, other than the adoptive parents, of legal rights to the adopted child. The court further concluded that any attempt to enforce the agreed 2014 residential schedule order following adoption would be contrary to public policy and law, and would necessarily fail. Therefore, the trial court found that adoption was not in M.J.W.'s best interests and denied the Miniums' petition.

The Miniums appeal.

## ANALYSIS

A. PATTI'S INTERVENTION[4]

CR 24 provides two independent means by which a party may intervene—(1) as a matter of right, and (2) by permission of the court. *Pub. Util. Dist. No. 1 of Okanogan County v. State*, 182 Wn.2d 519, 531, 342 P.3d 308 (2015). Here, the trial court allowed Patti to intervene by both means. However, the Miniums appear[5] to only challenge the trial court's ruling on intervention as of right. Nonetheless, we analyze the propriety of the trial court's ruling as to both means of intervention for completeness.

### 1. Intervention as a Matter of Right

We will reverse the trial court's grant of intervention as a matter of right only if an error of law has occurred. *Westerman v. Cary*, 125 Wn.2d 277, 302, 892 P.2d 1067 (1994). An error of

---

[4] Patti claims that the Miniums challenge her standing to intervene under chapter 26.33 RCW for the first time on appeal. But the record shows that the Miniums challenged Patti's standing to intervene below and based their response on the adoption policy inherent in chapter 26.33 RCW. Thus, we find that the Miniums did not waive their assignment of error by failing to assert it below.

[5] The Miniums' briefing challenges Patti's "right to participate" in the adoption proceeding, but the arguments do not differentiate between intervention as a matter of right and permissive intervention. Br. of Appellant at 17. The arguments that are made in the briefing, however, are focused on an intervention as a matter of right.

law is " 'an error in applying the law to the facts as pleaded and established.' " *Id.* (internal quotation marks omitted) (quoting *In re Jones' Estate*, 116 Wash. 424, 426, 199 P. 734 (1921)) .

A person shall be permitted to intervene as a matter of right:

[W]hen the applicant claims an interest relating to the property or transaction which is the subject of the action and the person is so situated that the disposition of the action may as a practical matter impair or impede the person's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

CR 24(a)(2).

Here, Patti claims she is allowed to intervene as a matter of right based on the 2010 residential scheduling order. Patti argues that the 2010 order vested her with "substantial visitation rights" and that the trial court did not err in allowing her to intervene in order to protect those rights. Br. of Resp't at 29. The Miniums argue that this claimed interest was insufficient to confer intervention as a matter of right because there is no statutory authority allowing a third party to intervene in order to protect their visitation interests. We agree with the Miniums.

The meaning of " 'interest' " under CR 24(a)(2) is to be interpreted broadly, with flexibility, and analyzed on a case-by-case basis. *Westerman*, 125 Wn.2d at 303. However, the interest that the intervenor seeks to protect must be an interest recognized by law. *Id.* Our Supreme Court "has repeatedly held that absent a valid statute, there is no right to third-party visitation under our existing laws." *In re Custody of M.W.*, 185 Wn.2d 803, 811, 374 P.3d 1169 (2016).

Indeed, several of Washington's nonparental visitation statutes have been found unconstitutional, both facially and as applied. *See In re Parentage of C.A.M.A.*, 154 Wn.2d 52, 66, 109 P.3d 405 (2005); *In re Custody of Smith*, 137 Wn.2d 1, 20-21, 969 P.2d 21 (1998), *aff'd sub nom*, *Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d. 49 (2000); *In re. Custody*

8

*of T.L.*, 165 Wn. App. 268, 282, 268 P.3d 963 (2011). In *Smith*, our Supreme Court held unconstitutional RCW 26.10.160(3) and former RCW 26.09.240, which allowed a nonparent to petition the court for visitation rights, because they impermissibly interfered with a parent's fundamental interest in the " 'care, custody and companionship of the child.' " 137 Wn.2d at 21 (quoting *In re Sumey*, 94 Wn.2d 757, 762, 621 P.2d 108 (1980)). Several years later, in *C.A.M.A.*, our Supreme Court held Washington's visitation statute unconstitutional, even though it had been amended to presume that a grandparent's visitation was in a child's best interest only if a significant grandparent-grandchild relationship was present. 154 Wn.2d at 57, 59. And most recently, in *M.W.*, our Supreme Court reaffirmed its prior holdings "that there is no statutory basis for third-party visitation under our laws." 185 Wn.2d at 813.

Thus, Patti's interest in safeguarding her third-party visitation with M.J.W. was not an interest recognized by law. Moreover, "[b]ecause the process of adoption is a creature of statute, the adoption statutes must be strictly followed." *In re Adoption of B.T.*, 150 Wn.2d 409, 416, 78 P.3d 634 (2003). Nothing in the adoption statutes allows a third party to intervene as a matter of right in order to safeguard their interests in maintaining visitation with the child. Under RCW 26.33.160(1), the only relatives whose consent is required for adoption, and thus the only relatives entitled to notice of an adoption, are the child's parents, the alleged father of a minor child, or a relative who is the child's legal guardian. *In re Adoption of R.L.M.*, 138 Wn. App. 276, 284, 156 P.3d 940 (2007), *review denied*, 162 Wn.2d 1023 (2008).

Because Patti's interest in maintaining third-party visitation with M.J.W. was not an interest recognized by law, the trial court erred in allowing Patti to intervene as a matter of right

in the adoption. However, as explained below, this error does not compel reversal because the trial court did not abuse its discretion in allowing Patti to permissively intervene.

2. Permissive Intervention

Even if a party does not claim an interest to allow intervention as a matter of right, the trial court may allow that party to intervene permissively "[w]hen an applicant's claim or defense and the main action have a question of law or fact in common." CR 24(b)(2). Here, the trial court also allowed Patti to permissively intervene.

The trial court has considerable discretion to allow intervention under this rule, and consequently, we will reverse such ruling only for an abuse of that discretion. *Pub. Util. Dist. No. 1 of Okanogan*, 182 Wn.2d at 531. " 'An abuse of discretion exists only when no reasonable person would take the position adopted by the trial court.' " *Id.* (internal quotation marks omitted) (quoting *Westerman*, 125 Wn.2d at 304).

The Miniums appear to argue that the trial court abused its discretion in allowing Patti to permissively intervene in the adoption proceeding because she was neither an adoptee nor a prospective adoptive parent. They also argue that nothing in chapter 26.33 RCW allows a third party to intervene for the purposes of objecting to an adoption.

As explained above, the Miniums are correct that nothing in the adoption statutes provided Patti the right to intervene in the adoption proceeding under CR 24(a). However, under CR 24(b), "anyone may be permitted to intervene in an action . . . [w]hen an applicant's claim or defense and the main action have a question of law or fact in common." And "[i]n exercising its discretion the

court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." CR 24(b)(2).

The Miniums do not dispute that Patti had an independent claim or defense with a law or fact common to their adoption petition. Instead, they argue that under *B.T.*, Patti could only participate in the adoption proceedings if she was a prospective adoptive parent. In *B.T.*, our Supreme Court held that a grandmother and stepfather had standing to intervene in a post-termination adoption proceeding, so long as they met the requirements of an adoptive parent under RCW 26.33.140(2).[6] 150 Wn.2d at 419.

However, the *B.T.* decision focused on standing to intervene as a statutory right. *Id.* at 416. The *B.T.* court never held that it would be an abuse of discretion for the trial court to allow permissive intervention of persons who have not filed adoption petitions themselves. In fact, the *B.T.* court

> recognize[d] that while the adoption process is a creature of statute, it is not such a technical one that the trial court is left without power to conduct evidentiary hearings to procure significant evidence or facts before granting or denying an adoption petition, and to allow the intervention of appropriate and interested parties.

*Id.* "The guiding principle behind the adoption process is to determine what is in the best interest of the child." *Id.* at 417. And in conducting a hearing under Chapter 26.33, "[t]he court may require the presence of witnesses deemed necessary to the disposition of the petition." RCW 26.33.060.

---

[6] RCW 26.33.140(2) provides that "[a]ny person who is legally competent and who is eighteen years of age or older may be an adoptive parent."

Here, the Miniums and Patti had entered into an agreed residential schedule regarding M.J.W. in 2010, when he was two years old. The residential schedule provided for frequent, regular visits with Patti. Thus, the record shows that beginning at the age of two, M.J.W. regularly visited and resided with Patti.

Given the long-term relationship between M.J.W. and Patti, deeming her presence necessary to determine the best interests of M.J.W. cannot be said to be a position that no reasonable person would take. In light of the trial court's power "to allow the intervention of appropriate and interested parties" in an adoption proceeding, we hold that the trial court did not abuse its discretion in allowing Patti to permissively intervene. *Id.* at 416.

B.    DENIAL OF ADOPTION PETITION

Next, the Miniums appear to argue that the trial court erred in denying their adoption petition because (1) the trial court erroneously concluded that the 2014 residential schedule would automatically terminate upon adoption, and (2) the trial court relied on speculation in reaching its decision. We disagree.

1.    Standard of Review

We review a trial court's determination that adoption is in the best interests of the adoptee for an abuse of discretion. *See In re Adoption of Hamilton*, 41 Wn.2d 53, 56, 246 P.2d 849 (1952) ("Trial courts must of necessity have a wide latitude of discretion in matters coming before them involving minor children, and their orders and judgments should not be disturbed by the appellate court except for very cogent reasons."); *In re Dependency of J.S.*, 111 Wn. App. 796, 804, 46 P.3d 273 (2002) ("Courts have broad discretion and are allowed considerable flexibility to receive and

evaluate all relevant evidence in order to reach a decision recognizing both the welfare of the child and the parental rights."). "A trial court abuses its discretion when its decision 'is manifestly unreasonable or based upon untenable grounds or reasons.' " *Salas v. Hi-Tech Erectors*, 168 Wn.2d 664, 668-69, 230 P.3d 583 (2010) (quoting *State v. Stenson*, 132 Wn.2d 668, 701, 940 P.2d 1239 (1997), *cert. denied*, 523 U.S. 1008 (1998)). A ruling is based on untenable grounds or reasons if the trial court applies the wrong legal standard or relies on facts that are unsupported. *Id.* at 669.

2.     Finding Based on 2014 Residential Schedule Order

The Miniums argue that the trial court erred when it found that granting their adoption petition "would automatically terminate" the 2014 residential schedule order. Br. of Appellant at 27. In doing so, the Miniums argue that the trial court used the residential visitation schedule "as a vehicle to deprive a child from a permanent adoptive home." Br. of Appellant at 32.

The Miniums' argument overlooks the guiding principle behind the adoption process, which "is to determine what is in the best interest of the child." *B.T.*, 150 Wn.2d at 417. The trial court was not tasked with deciding between a 2014 residential schedule and the Miniums' adoption petition. The trial court's inquiry was to determine whether adoption by the Miniums was in M.J.W.'s best interests. *See* RCW 26.33.240(3).

Based on the evidence at trial, the trial court found that M.J.W. was "thriving under the 2014 Residential Schedule." CP at 481. The residential schedule protected M.J.W. from instability and ensured he would not be "placed in a loyalty bind between the parties." CP at 481. And the court found that having a legal parent would have no positive effect on M.J.W.'s emotional

health or development. Thus, when weighed against the potential benefits of adoption, the trial court found that it was in M.J.W.'s best interest to maintain the status quo established under the 2014 residential schedule order. The Miniums do not argue that these were untenable grounds or reasons to deny the adoption petition. And they provide no support for their accusation that such ruling was intended to deprive M.J.W. of a permanent home.

Also, contrary to the Miniums' argument, adoption would have posed a grave risk to the status quo established under the 2014 residential schedule, as the trial court concluded. The entry of an adoption decree "divests any parent or alleged father who is not married to the adoptive parent . . . of all legal rights and obligations in respect to the adoptee." RCW 26.33.260(1). Upon entry of an adoption decree, "[t]he adoptee shall be, to all intents and purposes, and for all legal incidents, the child, legal heir, and lawful issue of the adoptive parent . . . and subject to all the obligations of a natural child of the adoptive parent." RCW 26.33.260(1). "[A] grandparent has no standing to petition for visitation rights subsequent to adoption of the grandchild by others, whether strangers or relatives." *In re Custody of B.S.Z.-S.*, 74 Wn. App. 727, 729, 875 P.2d 693 (1994) (holding that formal adoption terminated any visitation rights that a paternal grandmother may have had prior to adoption).[7]

The Miniums fail to show that the trial court abused its discretion in considering how adoption would upset the status quo established under the 2014 residential schedule. Accordingly, we hold that the Miniums' challenge fails.

---

[7] And even if the entry of an adoption decree did not automatically terminate Patti's visitation rights, the Miniums could have easily petitioned for modification of the 2014 residential schedule once they obtained the legal status of parents of M.J.W. *See* RCW 26.10.190.

3.      Evidentiary Ruling

The Miniums argue that the trial court abused its discretion in allowing Dillman and Pannell to testify as to whether adoption would likely affect M.J.W.'s visitation with Patti. The Miniums appear to argue that had the trial court properly excluded this evidence as speculation, then it would not have concluded that M.J.W.'s visitation with Patti might diminish or cease altogether following adoption. We disagree.

"We review a trial court's decision to admit or exclude evidence for an abuse of discretion." *Salas*, 168 Wn.2d at 668. A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or reasons. *Id.* at 669.

"Where there is no basis for the expert opinion other than theoretical speculation, the expert testimony should be excluded." *Queen City Farms, Inc. v. Cent. Nat'l Ins. Co. of Omaha*, 126 Wn.2d 50, 103, 882 P.2d 703 (1994). And conclusory or speculative expert opinions lacking adequate foundation shall not be admitted. *Stedman v. Cooper*, 172 Wn. App. 9, 16, 292 P.3d 764 (2012).

ER 701 governs the admissibility of opinion testimony by a lay witness. ER 701 limits lay opinion testimony to testimony "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge."

a.      Dillman's testimony

Dillman's testimony that adoption could potentially change Patti's visitation with M.J.W. was not based on theoretical speculation. Dillman testified that he had discussed the Shmilenkos

with Linda several times, and as a result of those discussions, he initially developed a very negative view of the Shmilenkos. He explained that Linda accused Patti of drug use and told him that Patti had forced M.J.W. to spend time with her, even though the visits caused M.J.W. considerable anxiety. After meeting with the Shmilenkos in person, Dillman learned that his view of the Shmilenkos based on his discussions with Linda was incorrect. Dillman also concluded, based on his visits with all the parties and M.J.W., that the antipathy between the Shmilenkos and the Miniums was negatively impacting M.J.W.

Thus, Dillman had personal knowledge of the animosity between the parties from his visits and discussions with the parties, and he could conclude, based on his observations and interviews, that the Miniums might seek to limit the Shmilenkos's visitation with M.J.W. following adoption. The trial court did not abuse its discretion in overruling the Miniums' objection to Dillman's testimony.

### b. Pannell's testimony

The Miniums also argue that the trial court abused its discretion in overruling their objection to a portion of Pannell's testimony regarding her opinion on future visitation. Pannell was the guardian ad litem appointed by the court to advocate for M.J.W.'s best interests in this case. In preparing her report, Pannell interviewed the Miniums and the Shmilenkos. She observed that the Shmilenkos had acted as "peacekeepers" in this case and tried to hire a mediator to resolve the issues between the parties. 5 VRP at 687. Linda reported to Pannell that Patti was unable to provide proper oversight over M.J.W., and that Patti was manipulative and controlling. During the course of her investigation, Pannell found Linda's accusations to be untrue. Pannell also

16

observed that during M.J.W.'s visitation exchanges, the Miniums would refuse to smile at, look at, or speak to the Shmilenkos. Pannell concluded that this tension between the parties was causing M.J.W. stomachaches.

Given the time Pannell spent observing and interviewing the parties, it was not manifestly unreasonable to allow her to testify, based on her personal observations, whether she believed that the Miniums might try to limit the Shmilenko's access to M.J.W following adoption. Pannell's testimony relating the tension between the Miniums and the Shmilenkos was based on her personal observations, and laid the foundation for her to testify whether she personally believed that adoption might impact the visitation schedule between the parties. Therefore, the trial court ruling was not based on untenable grounds or reasons, and we hold that it did not abuse its discretion in allowing this testimony.[8]

---

[8] Even if the trial court had abused its discretion, any error was harmless. An error is harmless if it does not affect the outcome of the case. *Mut. of Enumclaw Ins. Co. v. Gregg Roofing, Inc.*, 178 Wn. App. 702, 729, 315 P.3d 1143 (2013), *review denied*, 180 Wn.2d 1011 (2014). "[I]mproper admission of evidence constitutes harmless error if the evidence is cumulative or of only minor significance in reference to the evidence as a whole." *Hoskins v. Reich*, 142 Wn. App. 557, 570, 174 P.3d 1250, *review denied*, 164 Wn.2d 1014 (2008).

Here, even without Dillman's and Pannell's testimony, the trial court could easily have concluded that the Miniums might seek to limit Patti's visitation following an adoption. The animosity between the Miniums and Patti was readily evident throughout the course of trial. Linda testified that Patti was "manipulative, knows no bounds, is domineering, condescending, disrespectful and harmful." CP at 481. Greg testified that Patti was "an 'evil woman,' " and admitted that he tried to have the 2010 residential schedule order "thrown out of court." CP at 481; 1 VRP (June 6, 2017) at 135. Greg also admitted that he would abide by the 2014 residential schedule " 'with a grudge.' " CP at 482. Thus, even without Dillman's and Pannell's testimony, the trial court could conclude that the Miniums might limit Patti's visitation with M.J.W. following adoption based on the open hostility displayed by the Miniums, which was only bolstered by Dillman's and Pannell's testimony. Therefore, even if the trial court erred in allowing Dillman's and Pannell's testimony, any error was harmless.

C.    CHALLENGES TO FINDINGS OF FACT AND CONCLUSIONS OF LAW[9]

1.    Standard of Review

Findings of fact and conclusions of law are required "[i]n connection with all final decisions in adoption, custody, and divorce proceedings, whether heard ex parte or not."  CR 52(a)(2)(B).  When the trial court acts as a fact-finder, our review is " 'limited to whether substantial evidence supports the trial court's findings and whether the findings support its conclusions of law.' "  *In re Adoption of S.H.*, 169 Wn. App. 85, 101, 279 P.3d 474 (2012) (internal quotation marks omitted) (quoting *Commonwealth Real Estate Servs. v. Padilla*, 149 Wn. App. 757, 762, 205 P.3d 937 (2009)).  "Substantial evidence is evidence in sufficient quantum to persuade a fair-minded person of the truth of the declared premise."  *Ridgeview Properties v. Starbuck*, 96 Wn.2d 716, 719, 638 P.2d 1231 (1982).  The trial court's unchallenged findings of fact are verities on appeal.  *In re Dependency of J.A.F.*, 168 Wn. App. 653, 670-71, 278 P.3d 673 (2012).  We review a trial court's conclusions of law de novo by determining if the findings of fact support the conclusions of law. *Casterline v. Roberts*, 168 Wn. App. 376, 381, 284 P.3d 743 (2012).

---

[9] The Miniums also assign error to the trial court's order staying the adoption proceedings until Patti's motion to intervene could be heard. Because the Miniums provide no argument to this assignment of error, we decline to consider challenge.  *See* RAP 10.3(a)(6).  Also, the order temporarily staying the adoption proceedings is moot given that the trial court already lifted the stay. *See State v. Gentry*, 125 Wn.2d 570, 616, 888 P.2d 1105, *cert. denied*, 516 U.S. 843 (1995) (an issue is moot if this court can no longer provide effective relief).

2.      Challenged Finding of Fact

The Miniums appear to challenge finding of fact 10, which states, "[d]ue to this antipathy and history of conduct, this court finds that if the proposed adoption were granted, visitation with the SHMILENKOs would be diminished or stopped entirely and the status quo that is so critical to the child's development would be upset." CP at 482. The Miniums argue that this finding was not supported by substantial evidence because the trial court also found that there were no missed visits under the 2010 and 2014 non-parental custody orders.

The Miniums are correct that the evidence at trial did not show any missed visits under the 2010 and 2014 orders. However, as discussed above, there was evidence in sufficient quantum to support the trial court's finding of a history of antipathy between the parties. The evidence showed that Linda had falsely accused Patti of drug use, and told other witnesses that Patti was manipulative, controlling, and unable to properly care for M.J.W. Pannell observed that during exchanges of M.J.W., the Miniums refused to smile at, look at, or speak to Patti. Greg testified that Patti was an " 'evil woman,' " while Linda claimed that Patti was "manipulative, knows no bounds, is domineering, condescending, disrespectful and harmful." CP at 481. Moreover, Greg admitted that he had tried to have the 2010 residential scheduled order "thrown out of court." 1 VRP (June 6, 2017) at 135. Thus, there was evidence in sufficient quantum to support the trial court's finding that the Miniums and Patti had a history of antipathy and that if the Miniums became M.J.W.'s adoptive parents, they might try to diminish or stop Patti's visitation with M.J.W.

3.     Challenged Conclusions of Law

a.     Adoption automatically terminates third party visitation

The Miniums claim that the trial court concluded "that an adoption decree automatically terminates a third-party visitation order," and they challenge that conclusion.  Br. of Appellant at 1.  However, the trial court never concluded that an adoption decree would automatically terminate the third party visitation orders.  The trial court's first conclusion of law was, "Adoption of the child will terminate and divest everyone except the adoptive parents of legal rights to the child per RCW 26.33.260."  CP at 482.  This conclusion was an accurate recitation of RCW 26.33.260(1), which states that "[t]he entry of a decree of adoption divests any parent or alleged father who is not married to the adoptive parent or who has not joined in the petition for adoption of all legal rights and obligations."  Thus, we hold that the Miniums' challenge fails.

b.     Adoption not in M.J.W.'s best interest

The Miniums challenge the trial court's conclusion that adoption was not in M.J.W.'s best interests.  However, this conclusion was supported by the trial court's unchallenged findings that (1) M.J.W. was "thriving under the 2014 Residential Schedule," (2) "[t]he status quo is optimal for the child and, therefore, protection of the status quo is in the child's best interest," (3) "[t]he 2014 residential schedule protects the child from instability and from being placed in a loyalty bind between the parties," (4) that "[b]estowal of the titles 'adopted' and 'legal parent' would have no positive emotional or developmental effect on [M.J.W.]," and (5) that "[M.J.W.] should continue to be parented in the future under the 2014 residential schedule."  CP at 481-82.  Therefore, we hold that the Miniums' challenge to this conclusion of law fails.

CONCLUSION

The trial court erred in allowing Patti to intervene in the adoption proceeding as a matter of right, but did not abuse its discretion by allowing Patti to intervene permissively or in finding that adoption by the Miniums was not in M.J.W.'s best interests. Accordingly, we affirm.

_____, A.C.J.
Lee, A.C.J.

We concur:

_____
Worswick, J.

_____
Sutton, J.