IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Parental Rights to I.C.M.M. | No. 87655-4-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

DíAZ, J. — A superior court terminated Mr. M.'s parental rights as to his biological daughter, I.C.M.M., in December 2024. He claims the court's decision improperly relied on his race and ethnicity and that the court erred by concluding the Department of Children, Youth, and Families (DCYF) had provided services as required by RCW 13.34.180(1). Disagreeing, we affirm.

## I. BACKGROUND

The following facts from the court's termination order and the parties' briefs are not contested.

I.C.M.M.'s biological father, Mr. M., was born in rural Honduras and he primarily communicates in Spanish. His own father left the family when he was a young child and his mother also could not care for him, so he was raised by his grandparents in a rural area. He immigrated to the United States as a teenager in

approximately 2008.

Mr. M. met I.C.M.M.'s biological mother, Ms. C., around 2012, and they co-parented several children until they separated after I.C.M.M. was born in 2016. I.C.M.M. has three older half-siblings born to Ms. C. and they all lived together for a period.

In March of 2019, the children were removed from the custody of Mr. M. and Ms. C.,  both of whom the State criminally charged for abuse.  Ms. C pled guilty to one count of assault in the second degree and two in the third degree, all designated as domestic violence offenses.  Mr. M. pleaded guilty to three counts of assault in the third degree, admitting to acting with criminal negligence and causing bodily harm to the three older children.

Then, in June of 2019, the court entered agreed orders of dependency for, inter alia, I.C.M.M., under RCW 13.34.030(6)(c)—as to both parents.[1]

DCYF first petitioned for the termination of Mr. M.'s parental rights in August 2021.  In its third amended petition, filed in July 2024, DCYF alleged the following parental deficiencies: "Ongoing risk of physical abuse and failure to protect, all of which impair the father's ability to safely parent.  Inadequate parenting skills to provide for the child's emotional, mental, and developmental needs."  DCYF claimed I.C.M.M. "expressed having seen her father hurt her siblings and being afraid he would kill her mother or her siblings." It also alleged she said that "her father allowed his friends to come into the home and these men would sexually

_____

[1] Not a party to this appeal, Ms. C.'s parental rights were terminated in January 2024.

abuse her" and she "expressed being abused by men while they were having sex with her mother." Mr. M.'s visitation with I.C.M.M. was suspended in April 2022 because she experienced "ongoing extreme trauma reactions related to visiting with [him]."

Mr. M. underwent three examinations over the course of the dependency after the court ordered DCYF to refer him for a psychological evaluation, and he ultimately took part in a neuropsychological evaluation, which was conducted in Spanish. Mr. M. also participated in parenting and family preservation services, as well as individual psychotherapy.

The court held a bench trial on the State's termination petition over eight days in October and November 2024. It heard testimony from Mr. M. and I.C.M.M., as well as from mental health counselors, DCYF social workers, a court-appointed special advocate (CASA), case managers, psychologists, and neuropsychologists.

On the date of the termination order, I.C.M.M. was eight years old. She had lived in a foster home since 2020, with multiple significant and ongoing special needs regarding her mental and emotional health.

At the conclusion of the 2024 trial, the court's termination order identified Mr. M.'s parental deficiencies as follows: an inability to protect I.C.M.M. from abusive situations, engaging in inappropriate physical discipline, and an inability to provide for her social, physical, mental, educational, and emotional needs. It ultimately concluded he could not correct those deficiencies within the foreseeable future, or even reinitiate contact with her within such a period without jeopardizing her mental health. In explaining its termination decision, the court reasoned:

3

Even though the father has received and extensively participated in services, the Court finds that the father is not prepared or able to handle [I.C.M.M.]'s very challenging behaviors and trauma-triggered responses. His inability to acknowledge his role in the abuse of [I.C.M.M.] and her siblings, and his inability even to recognize that [I.C.M.M.]'s mental health and behavior have been impacted by that abuse, renders him unable to meet her substantial needs.

It found Mr. M. unfit to parent I.C.M.M. and terminated his rights. He timely appeals.

## II.     ANALYSIS

## A.     Alleged Racial Bias

Mr. M. argues the court disregarded our Supreme Court's declaration in Henderson v. Thompson, 200 Wn.2d 417, 422, 518 P.3d 1011 (2022), that "racial bias has no place in a system of justice." He avers that racial bias was a factor in the court's decision because he claims the court "expressly" concluded his cultural background "made it impossible to remedy his parental deficiencies."

In Henderson, our Supreme Court set out a two-part test for addressing claims of racial bias raised in a civil trial. It held, "*upon a motion for a new civil trial*, courts must ascertain whether an objective observer[—]who is aware that implicit, institutional, and unconscious biases . . . have influenced jury verdicts in Washington State[—]could view race as a factor in the verdict." Id. at 435 (citing State v. Berhe, 193 Wn.2d 647, 665, 444 P.3d 1172 (2019)) (emphasis added). If a civil litigant makes "a prima facie showing sufficient to draw an inference of racial bias" under that standard, then a trial court must grant an evidentiary hearing to determine its effect on the verdict and decide whether to order a new trial under

CR 59.[2]  Id.

However, this court has since declined to review claims based in Henderson where an appellant did not assert a claim of racial bias before the trial court.  See, e.g., Aiken v. Sanchez, No. 84876-3-I, slip op. at 22 (Wash. Ct. App. May. 28, 2024) (unpublished), https://www.courts.wa.gov/opinions/pdf/841157.pdf; Kindt v. Cunningham, No. 87169-2-I, slip op. at 14-15 (Wash. Ct. App. June. 16, 2025) (unpublished), https://www.courts.wa.gov/opinions/pdf/871692.pdf;[3] see also RAP 2.5(a) (an "appellate court may refuse to review any claim of error which was not raised in the trial court.")

Even more specifically, we have held the same in several appeals from termination orders when the party did not raise such a claim at trial or sought a new trial on that basis.  See, e.g., In the Matter of the Dependency of N.M.L.H, No. 84876-3-I, slip op. at 22 (Wash. Ct. App. June. 24, 2024) (unpublished), https://www.courts.wa.gov/opinions/pdf/848763.pdf.

Our opinion in Matter of Dependency of Aa.D.Y., No. 83410-0-I, slip op. at 25-27 (Wash. Ct. App. May 30, 2023) (unpublished), https://www.courts.wa.gov/opinions/pdf/834100%20Order%20and%20Opinion.pdf, is instructive.  There, we acknowledged "race-based discrimination exists in child welfare proceedings," but we held that the appellant's claim failed both because

---

[2] At such hearings, courts must presume racial bias affected the verdict, and the party benefiting from the alleged racial bias has the burden to prove it did not. Henderson, 200 Wn. 2d at 435.  If that party cannot prove that racial bias had no effect on the verdict, the verdict is "incompatible with substantial justice" and a new trial is required under CR 59(a)(9).  Id.

[3] We cite to these cases, pursuant to GR 14.1, as necessary for a reasoned decision.

"no party raised or perceived such a risk or raised the issue in the trial court" and because we were not persuaded "bias affected the termination proceedings" when the court's comments were "read in light of the overall ruling" rather than "taken out of context[.]" Id.[4]

Here, we conclude Mr. M.'s claim of racial bias fails for precisely the same reasons: the issue was waived and, when read in context, it also fails on the merits.

As to waiver, Mr. M. concedes he did not raise the issue of alleged racial bias before the trial court. Consistent with N.M.L.H. and Aa.D.Y., "[i]t is not the role of an appellate court . . . to address claims where the trial court could not have foreseen the potential error or where the prosecutor or trial counsel could have been justified in their . . . failure to object." State v. O'Hara, 167 Wn.2d 91, 100, 217 P.3d 756 (2009), as corrected (Jan. 21, 2010); see also Smith v. Shannon, 100 Wn.2d 26, 37, 666 P.2d 351 (1983) (holding that "[f]ailure to raise an issue before the trial court generally precludes a party from raising it on appeal.. . . The reason for this rule is to afford the trial court an opportunity to correct any error, thereby avoiding unnecessary appeals and retrials.") Here, Mr. M. not only failed to ask for a new trial on that basis, but he did not make any related objection to preserve the error he now asserts.

Mr. M. asserts his claim is preserved as manifest constitutional error under RAP 2.5(a)(3). However, he provides only two conclusory sentences in his reply brief for this assertion, summarily stating that Berhe "made clear this issue is one

---

[4] We cite to these cases, pursuant to GR 14.1, as necessary for a reasoned decision.

of a constitution [sic] dimension" and there is a "plausible showing the alleged error had "practical and identifiable consequences" in the proceedings. This argument is both inadequate and untimely. Norcon Builders, LLC v. GMP Homes VG, LLC, 161 Wn. App. 474, 486, 254 P.3d 835 (2011) (holding that this court "will not consider an inadequately briefed argument."); see also Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) (holding that "[a]n issue raised and argued for the first time in a reply brief is too late to warrant consideration.")

Nonetheless, given the serious nature of his claims, we consider the merits as if he had sought a new trial. We first determine whether he could have made a prima facie case that racial bias affected the verdict.

Mr. M. argues the objective observer standard from Henderson is "easily" met because the trial court explicitly "relied on Mr. M.'s race and ethnicity as the basis for terminating his parental rights." He argues the court made comments which "in no uncertain terms, punish[ed] Mr. M. for not being better acculturated to the United States and less beholden to his cultural upbringing." He even claims there is "no doubt racial and ethnic stereotyping impacted the decision" to terminate Mr. M.'s parental rights because the trial court "*admitted* it." We disagree for three reasons.

First, while the court did make comments mentioning Mr. M.'s language and culture, there is no indication, when read in context, it based its termination decision on those observations.

Specifically, the court made the following oral ruling:

[I]t's clear to me that [Mr. M.]'s language and cultural barriers have contributed both to the delays in this case and to his inability to remedy his parental deficiencies. And I think it may be culture as much as language. And that is sad and makes it, you know, harder to do this. I believe that ultimately [Mr. M.] really isn't going to understand why I'm doing what I'm doing for the -- perhaps some of the same reasons that he seems unable to understand [I.C.M.M.]'s traumas and needs. *But that really doesn't change the findings I need to make and what is in [I.C.M.M.]'s best interests here.*

The court then acknowledged Mr. M. had "worked hard to try—in terms of showing up and doing services to try to move and change things[,]" but held "ultimately . . . what prevents . . . progress from happening, and what puts [I.C.M.M.] in danger and makes you an unfit parent is the fact that you still will not acknowledge your part -- the abuse that happened in that household, your part in it, and your part in [her] trauma or why [she] might be traumatized."

Thereafter, it mentioned his culture only once more when it stated:

And, frankly, even that failure to acknowledge may be in part due to cultural barriers and educational barriers. I think, you know, someone more sophisticated than [Mr. M.] with a better cultural understanding might have better understood how important it would be for him to acknowledge the abuse and trauma that occurred, as opposed to continuing to deny it. *But the reality is that that failure means that* he could not make progress; [I.C.M.M.] could not progress to wanting to spend any time with him; and, therefore, *no progress could be made to remedying parental deficiencies towards reunification.*

Similarly, the court's written order concluded:

. . . ultimately what prevents progress and puts [I.C.M.M.] at risk of [Mr. M.] being an unsafe parent is his inability to acknowledge his part as well as his lack of ability to understand her mental health needs. This could be, in part, due to cultural barriers. *But regardless of the cause* of [Mr. M.]'s unwillingness to acknowledge the past and inability to understand [I.C.M.M.]'s needs, *those deficits render him an unsafe and unfit parent for [I.C.M.M.].*

8

We hold that none of these statements are comparable to the statements at issue in Henderson, which "evoke[d] . . . harmful stereotype[s]," appealed to implicit racial bias, and therefore permitted the inference that an objective observer could conclude race was a factor in the outcome. 200 Wn.2d at 436. The court here did not allude to "racist stereotypes" of any kind, let alone convey a "false stereotype" based on his race. Id. at 437. There is nothing in the court's comments that suggest it made its decision based on a belief that, for example, Latinos are prone to child abuse, even assuming such a stereotype is trafficked in our culture.

Instead, when viewed in their full context, the court affirmatively made clear it did not base its decision on Mr. M.'s culture, let alone on his ethnicity or race. It specifically explained that barriers to reunification existed, no matter their cause or the possibility that cultural influences had some role to play. Even if there was something inappropriate in referring to Mr. M's upbringing and culture—which there is not, as explained below—the court's decisions were based on the existence of insurmountable barriers to reunification.

And evidence of those barriers was significant. Professional reports and other testimony described in detail the abuse experienced in Ms. C. and Mr. M.'s household, which included: bruising caused by a rod; getting hit with electrical cords and belts; sometimes while handcuffed; scars from being burned; being forced to eat their own feces after a potty-training accident and losing a tooth after being hit in the face; and exposure to weapons and drugs. The children had reported the abuse was committed both by their mother and Mr. M., and after one of the children disclosed Mr. M. hit them, the other siblings reportedly responded,

9

"No he doesn't, you're not supposed to say that." Moreover, it was apparent I.C.M.M. likely saw some of this or other abuse because she suffered from severe behavioral issues, such as screaming, extreme prolonged tantrums, physical aggression towards adults including the foster parents, destruction of belongings, bedwetting, nightmares, inappropriate sexualized behavior, hypervigilance, trauma-related flashbacks, and suicidal statements.

In this context, and given this unchallenged evidence, it is clear why the court would cabin any cultural explanation and base its decision on Mr. M.'s denial that he had played any role in the abuse—which he never acknowledged occurred—and his resulting inability to recognize I.C.M.M.'s mental health needs, which arose from that trauma.

In short, based on the court's statements alone, viewed in their full context, we hold that no objective observer could view race as a factor in the court's termination decision.

Second, two of Mr. M.'s own witnesses testified about his cultural background throughout the termination trial. Dr. Claudette Antuña opined that Mr. M. did not understand the cultural nuances of living in the United States. And another, Dr. Tedd Judd, endorsed a recommendation for cultural coaching because Mr. M. came from a rural area in Honduras with limited education.[5] Thus,

---

[5] Neuropsychologist Dr. Melissa Castro also offered testimony which referenced Mr. M.'s language and culture. RP 136 (Explaining her analysis of Mr. M. had been "culturally sensitive" because she used norms developed for people from Latin America and compared him to others from Honduras with the same age and education); id. at 137 (reiterating her assessment "was very much tailored to someone of his cultural and linguistic background.")

the court simply addressed and incorporated facts raised by Mr. M. himself.

Third, the court's commentary served to recognize that Mr. M.'s particular language and culture were a part of his identity and life experience. We cannot agree with the idea that simply naming a person's cultural identity—let alone race—demonstrates an underlying bias. We note that such reasoning runs counter to a scholarly study which found overt mentions of race actually increased judges' tendency to guard against the influence of implicit bias in their decisions. See Bernice Donald, Jeffrey Rachlinski & Andrew J. Wistrich, *Getting Explicit About Implicit Bias*, 104 JUDICATURE, no. 3 (2020-21), at 76; Andrew J. Wistrich & Jeffrey J. Rachlinski, *Implicit Bias in Judicial Decision Making: How It Affects Judgment and What Judges Can Do About It*, in ENHANCING JUSTICE: REDUCING BIAS 99 (Sarah E. Redfield ed., 2017) (concluding that "thinking about race explicitly is a better approach than trying to ignore it.") We are concerned that holding otherwise in this case would chill discussions of culture, identity, and even implicit bias in a way contrary to the intent of Henderson and GR 37.

Thus, we have no reason to believe that "racism affected the verdict" and Mr. M. has not established a prima facie case entitling him to an evidentiary hearing or for us to further consider this first assignment of error. Henderson, 200 Wn.2d at 439.

B.    Alleged Failure to Provide Required Services

Next, Mr. M. asserts that DCYF failed to meet its required burden under RCW 13.34.180(1)(d) in three ways, which we address in turn.

Pursuant to Chapter 13.34 RCW, DCYF must establish by clear, cogent,

and convincing evidence that it satisfied six elements within RCW 13.34.180(1) before a court may terminate a person's parental rights. In re Dependency of G.C.B., 28 Wn. App. 2d 157, 171, 535 P.3d 451 (2023).

RCW 13.34.180(1)(d) requires that the Department show all court ordered services "have been expressly and understandably offered or provided," as well as "all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future."

The term "necessary services" is not defined in the statute, but our Supreme Court has held that the following definition is consistent with the plain language of the statutory scheme: "those services 'needed to address a condition that precludes reunification of the parent and child.'" Matter of K.M.M., 186 Wn.2d 466, 480, 379 P.3d 75 (2016) (quoting In re Dependency of A.M.M., 182 Wn. App. 776, 793, 332 P.3d 500 (2014)).

"[T]erminations are fact specific and must be decided on a case by case basis." In re Welfare of N.M., 184 Wn. App. 665, 672, 346 P.3d 762 (2014). "Our role in reviewing a trial court's decision to terminate parental rights is limited to assessing whether substantial evidence supports the trial court's findings." Matter of D.H., 195 Wn.2d 710, 718, 464 P.3d 215 (2020).

"Substantial evidence" is evidence in sufficient quantum to persuade a fair-minded person of the truth of the declared premise. In re Adoption of M.J.W., 8 Wn. App. 2d 906, 925, 438 P.3d 1244 (2019). In addition, the applicable "clear, cogent, and convincing" standard is met when the ultimate fact in issue is shown by the evidence to be "'highly probable.'" In re Dependency of K.R., 128 Wn.2d

129, 141, 904 P.2d 1132 (1995) (quoting In re Welfare of Sego, 82 Wn.2d 736, 739, 513 P.2d 831 (1973)); Mueller v. Wells, 185 Wn.2d 1, 10 n.5, 367 P.3d 580 (2016) (noting this standard requires "more than a preponderance of the evidence, but less than what is needed to establish proof beyond a reasonable doubt.")

Therefore, taken together, we will not disturb a trial court's factual findings as to whether DCYF met its burden "unless there is an absence of clear, cogent, and convincing evidence in the record." D.H., 195 Wn.2d at 718. Put differently, "[t]he court's factual findings must be upheld if supported by substantial evidence from which a rational trier of fact could find the necessary facts by clear, cogent, and convincing evidence." In re Dependency of K.S.C., 137 Wn.2d 918, 925, 976 P.2d 113 (1999).

Such "deference to the [lower court's] findings is of particular importance" because "[t]he trial judge has the advantage of having the witnesses before him or her." Id. Accordingly, "[w]e defer to the trial court's weighing of the evidence and witness credibility determinations." D.H., 195 Wn.2d at 718. And we may affirm the trial court's findings on any grounds supported by the record. Johnson v. Liquor & Cannabis Bd., 197 Wn.2d 605, 611, 486 P.3d 125 (2021).

1. Psychological Evaluation with Parenting Component

The first way Mr. M. argues DCYF did not satisfy RCW 13.34.180(1)(d) is that it did not provide all court ordered services. Specifically, he avers it did not adequately or timely provide him with a psychological evaluation which included a parenting component, as ordered by the dependency court. He then argues DCYF *never* provided him with one. These arguments fail for several reasons.

13

For one, the record does not support that DCYF failed to provide the services that the dependency court ordered. In its initial 2021 dependency order, the court did require that DCYF provide Mr. M. with a psychological evaluation "with a parenting component," but it did not expressly require a parent-child observation. To the contrary, it subsequently modified its initial order and prohibited such an interaction, because it adopted a recommendation that Mr. M. and I.C.M.M. have no contact. It ordered I.C.M.M. should be evaluated on her own and specified her individual evaluation "shall substitute *for* the parent child observation anticipated to be included in the parenting assessment or in a psychological evaluation of the parent."

What's more, the court never defined "parenting component" in any other detail, and regardless, Dr. Melissa Castro's neuropsychological evaluation expressly noted that she assessed his parenting abilities.

Mr. M.'s argument also rests in large part on the allegation there was an impermissible delay between when DCYF initially attempted to refer him for an evaluation (September 2022) and his ultimate evaluation (in May 2024). However, our Supreme Court has explained that a delay, on its own, does not constitute a total failure to provide necessary services. See Matter of D.H., 195 Wn.2d 710, 725, 464 P.3d 215 (2020). Rather, "the Department fails to provide all necessary services where the earlier delay in one service creates a *separate* deficiency or results in an *unaddressed* deficiency." Id. (emphasis added). It specified, "[t]his occurs in instances where [1] the Department takes a sequential approach and withholds a service or program and that decision engenders *additional* parent-child

bonding and attachment issues," or "[2] where the delay results in the Department ultimately *never* providing the service." Id. at 725–26 (emphasis added).

Thus, Mr. M. does not establish that the delay "create[d] a separate basis for termination or result[ed] in the complete failure to provide a necessary service." D.H., 195 Wn.2d at 726 (emphasis added). And, "[e]ven if the delay was attribut[able] to the Department," he (1) *did* receive a neuropsychological evaluation before the trial, and (2) he was "participating in treatments that were recommended" in the interim. See id.

Finally, Mr. M. provides no legal authority for his assertion that a "neuropsychological evaluation cannot substitute for a psychological evaluation."[6] DeHeer v. Seattle Post-Intelligencer, 60 Wn.2d 122, 126, 372 P.2d 193 (1962) ("Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none.") In other words, he provides no case for the proposition that because psychology and neuropsychology are technically distinct fields, that means a report from one discipline cannot be equivalent to the other for purposes of DCYF's obligations under RCW 13.34.180(1)(d). In fact, as a matter of its substance and function, Dr. Castro's neuropsychological evaluation appears to have met the purpose of the original order for a psychological evaluation; namely, to provide a professional scientific assessment of Mr. M.'s mental state to better identify his

---

[6] Mr. M. also does not assign error to the court's findings on this basis. See Br. of App. at 7; Clark County v. W. Wash. Growth Mgmt. Hrgs Rev. Bd., 177 Wn.2d 136, 144, 298 P.3d 704 (2013) (noting the scope of a given appeal is determined, in part, by the appellant's assignments of error).

needs and capacities as a parent.  Thus, this claim fails.

   2.  Services for Domestic Violence Victims

Mr. M. also argues DCYF did not meet its obligation to investigate and identify his particular needs, claiming it ignored his experience of domestic violence and did not "investigat[e] how Ms. C.'s consistent dehumanizing abuse of Mr. M. affected his ability to parent" and offer related services.

Thus, he assigns error to the court's findings which concluded DCYF provided adequate services:

Mr. M. is correct that "[w]ithin the prerequisite of RCW 13.34.180(1)(d), the services must be tailored to the needs of the individual."  D.H., 195 Wn.2d at 727.  This means "[t]he Department is required 'to identify a parent's specific needs and provide services to meet those needs.'"  Id. (Quoting In re Parental Rights to I.M.M., 196 Wn. App. 914, 924, 385 P.3d 268 (2016)).  However, his argument that DCYF failed to do so is unsupported.

Namely, the record contradicts his claim that DCYF did not identify Mr. M. had a specific need to process Ms. C's abuse and its effect on his parenting and then provide any related services.  There is substantial evidence it did identify this need when it asked the initial psychologist who examined him to identify whether she recommended any additional services "to ensure that any and all concerns of abuse or neglect are adequately addressed and that [Mr. M.] may be able to parent his daughter long term."  Dr. Antuña responded Mr. M. should "participate in culturally competent, linguistically sensitive individual psychotherapy in order to understand the dynamics behind his attraction to [Ms. C.]and how he became

16

entrapped in a cycle of abuse." And there is evidence it did provide related services because Mr. M. participated in about five months of individual psychotherapy DCYF arranged thereafter.

Mr. M. nonetheless contends that DCYF did not investigate the extent of "the problem" posed by the abuse he experienced from Ms. C., and he claims it "summarily dismissed the entirety of Dr. Antuña's report" in a "clear dereliction of its duty." Though DCYF did later seek additional evaluations, Mr. M. does not identify any specific action or inaction by DCYF showing that it rejected the first report in its entirety as he claims, and thereby failed to investigate and respond to his individual need to process abuse by Ms. C. See Cowiche Canyon Conservancy, 118 Wn.2d at 819 (holding we are not required to search the record to locate the portions relevant to a litigant's arguments). To the contrary, DYCF did provide him with individual psychotherapy as the first report had recommended, to assist him in processing the abuse he suffered.

3. Culturally Competent Services

Finally, Mr. M. argues DCYF failed to consistently ensure he received culturally competent services. This claim is undeveloped, unsupported, and ultimately unpersuasive.

DCYF initially referred Mr. M. to Dr. Alysa Ruddell for a psychological evaluation, and she assigned the case to Dr. Antuña, who was able to evaluate him in Spanish. She issued a report in August 2022, but in September 2022, the court granted a motion DCYF had filed to complete a new psychological evaluation. It explained the first report did not satisfy its order because (1) it was

17

written by Dr. Ruddell, who had not actually met with Mr. M. and (2) Dr. Antuña did not consider collateral evidence about the full extent of the abuse and criminal cases which had been provided to her.

DCYF subsequently referred Mr. M. to another doctor, Dr. Sierra Swing, after he retained Dr. Judd—who it had wanted to use—as a defense expert. Dr. Swing issued a report in August 2023 after conducting testing with a third-party interpreter because she does not speak Spanish. She noted Mr. M. and his interpreter had difficulty with translation during the testing. Her report also included recommendations for numerous services including individual therapy, parenting education and support groups, and a neurocognitive assessment.

To provide the latter service, DCYF searched for a suitable neuropsychologist and eventually referred him to Dr. Castro who spoke Spanish and examined him in Minnesota in May 2024. In August 2024, she issued a report which summarized that DCYF had referred the case for her to evaluate Mr. M.'s "risk to his child and his needs in order to reunify and safely parent his daughter long-term [due to] concerns he has been unable to provide adequate safety and support for his child's well-being." Her report noted he was already engaged in psychotherapy and did not make any recommendations for additional services beyond those he was already engaged in. ("I have no additional recommendations for Mr. M[.] beyond what has already been pursued.")

However, Dr. Castro criticized the validity of the psychological testing and procedures Dr. Swing had used, because of translation issues and because she had not employed metrics considering Mr. M.'s language and culture. Dr. Judd

18

agreed with those concerns and testified Dr. Swing's use of testing was "in large part invalid."

Considering all of this, the court agreed Dr. Swing's testing and methodology had been "flawed" because of "language and cultural barriers where the tests had not been normed for Spanish-speaking or Honduran populations." Thus, it found Dr. Swing's "use of interpreters was not valid and did not satisfy the provision of that service." However, overall, it concluded "that deficiency was remedied by the comprehensive evaluation completed by Dr. Castro in Spanish."

Mr. M. now challenges the court's related findings:

- Even without considering Dr. Swing's report or her testimony in its entirety, the Court still finds that all of the 13.34.180 elements have been met by clear, cogent, and convincing evidence.

- The Department was cognizant of the father's cultural background.[7]

We disagree for the following reasons.

First, Mr. M. cites requirements related to cultural competency which were satisfied here. See RCW 74.04.025(1) ("In the case of non-English speaking parents, this includes bilingual services, qualified interpreters, and written communications in the native language.") He does not dispute that DCYF ensured he had access to interpreters and translation of its service letters and Dr. Castro's evaluation was conducted in Spanish.

---

[7] Also, it is worth reiterating that, while it is true the court concluded Dr. Swing's evaluation was conducted deficiently, it also concluded Dr. Castro's subsequent evaluation in Spanish was satisfactory and carried out competently. We do not reweigh the evidence and defer to its credibility determinations. D.H., 195 Wn.2d at 918.

Second, the crux of Mr. M.'s argument is that by demanding he comply with services recommended in Dr. Swing's report, DCYF inappropriately continued to rely on her evaluation even though there was "ample" evidence the report was "irredeemably flawed" for "not [being] cognizant of [his] particular cultural circumstances." Yet his sole support for asserting "Dr. Swing's evaluation of Mr. M. was fundamentally flawed and unacceptable" are the critiques which Castro and Judd raised about her testing methodology. Also, he does not cite anywhere in the record to support his specific contention DCYF "continu[ed] to proffer that Dr. Swing credibly addressed Mr. M.'s ability to parent." He simply argues in vague terms that DCYF failed to provide culturally competent services because it was "guided" by Dr. Swing's report, ostensibly referring to the fact that it provided services from among her treatment recommendations.

This argument is unavailing because it simply does not follow that problems with Dr. Swing's testing methods inherently meant all the services in her report were culturally incompetent recommendations. Moreover, Mr. M. does not identify any particular service he claims was culturally inappropriate.

At oral argument, he similarly asserted in general terms that "there is nothing in the record that says [Dr. Swing's report] is good enough." Wash. Ct. of Appeals oral argument, In the Matter of the Parental Rights to I.C.M.M., No. 87655-4-I (January 6, 2026), at 19 min., 08 sec. through 19 min., 13 sec. video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2026011123/?eventID=2026011123. But he has offered nothing in the record indicating Swing's recommended services were not culturally

20

competent. In fact, the record belies such a suggestion. Dr. Castro—whose cultural competency Mr. M. does not question, see id. at 19 min., 31 sec. through 19 min, 39 sec.—raised no issues with the services DCYF pursued after receiving Dr. Swing's report, and she did not recommend any different ones.

In summary, Mr. M. does not provide legal authority or persuasive support for his arguments that DCYF failed to provide required services. As a result, he has not shown the record lacks evidence from which a rational trier of fact could find it did provide all necessary services, on a clear, cogent, and convincing standard. K.S.C., 137 Wn.2d at 925. Therefore, we do not disturb the court's conclusion that DCYF satisfied RCW 13.34.180(1). D.H., 195 Wn.2d at 718.

III. CONCLUSION

We affirm.

Díaz, J.

WE CONCUR:

Birk, J.                Coburn, J.

21